# UKMAN, Appellant, v. DAILY RECORD COMPANY.

### Division One, June 15, 1905.

1. **LIBEL: Nonsuit.** The court can direct a nonsuit in a libel suit, but cannot coerce a verdict for plaintiff from the jury.

2. **LIBEL AND SLANDER: Same Words.** Libel differs from slander in that a publication may be libelous when if spoken orally it would not be slanderous. Not so much gravity is allowed to spoken words as to words deliberately written and published, the latter justifying the inference that they are the expression of settled conviction and affect the public mind correspondingly. Many words which would not be slanderous *per se* when spoken, become libelous *per se* when written and published.

3. **LIBEL: Per Se: Of Merchants.** A false publication, impairing the credit of a merchant or trader by importing insolvency,

dishonesty or trickery touching his trade or business, is libelous *per se*, the malice being supplied by implication of law.

4. ——: ——: **Allegation and Proof.** Where the publication is libelous *per se*, special damages may be, though they need not be, alleged and proven.

5. ——: ——: ——: **Latent Meaning: Innuendo.** Where the alleged libel is claimed to bear a latent and hidden meaning, which can only appear from extrinsic circumstances, the complaint should set forth in prefatory allegations by way of inducement such extrinsic facts, and the libelous charge should be followed by an innuendo applying the words used to the matter pleaded by way of inducement, and such innuendo should not be a forced but a reasonable construction and application of the words used.

6. ——: ——: ——: ——: ——: **Insolvency: Proof: Nonsuit.** The petition alleged that plaintiff was engaged in selling cigars, and that defendant published in its newspaper these words: "Bills of sale—A. G. Ukman, 612 Chestnut, to Miss A. Handshiegel; Cigar outfit, $1;" and by way of innuendo that the words meant that plaintiff had sold his business and stock of goods for the nominal consideration of one dollar; and it is contended that the words used imputed insolvency or dishonest trickery in a business way. *Held*, that the words of the news item, in and of themselves, bear no libelous edge, and that by the contention he seeks to enlarge the meaning of the words, as set forth in the innuendo, which he cannot do, for if he desired to attribute to the words used such meaning he should have so framed his innuendo. *Held*, second, that, admitting, by way of strained construction, that the words impute insolvency, yet, as under the evidence he was shown to be insolvent at the time of the publication, the charge is met by proof of that fact, and he was properly nonsuited at the close of the evidence. *Held*, third, that the words do not, by fair construction, bear a meaning of a charge of dishonest trickery in a business way.

7. ——: **Insolvency: Defense.** The truth is a defense in a libel, and a charge of insolvency is fully met by proof of the fact.

8. ——: ——: **Trick in Business: Nominal Consideration.** A nominal consideration (e. g., one dollar) is the usual method of indicating that there are other considerations which are not mentioned, and the consideration of a contract is always open to explanation. Besides, if the transaction be a private business dealing, it might be dealt with throughout, as such, and the true consideration withheld from the general public. Hence, the publication that the consideration for the sale of "cigar outfit" was one dollar, when in fact the bill of sale in the recorder's office, where the bill was filed and where the paper

got its information, showed that it was $700, does not, by fair consideration, bear a meaning of a charge of dishonest trickery in business, by plaintiff as a wholesale and retail dealer in cigars.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Bass & Brock* for appellant.

(1) It is well settled that, where the words published are in writing and impute fraud, they are actionable *per se,* regardless of whether or not a crime is charged. Sullivan v. Com. Co., 152 Mo. 268; Houstan v. Woolley, 37 Mo. App. 15; Lanius v. Druggist Pub. Co., 20 Mo. App. 12. And especially is this true when plaintiff is a man in business where the words touch him in his business. Nolinger v. Vogt, 88 Mo. 589; Rammell v. Otis, 60 Mo. 365. (2) The law has special regard for the reputation of men which they have acquired as merchants or traders, and written words which impute to traders or other business men insolvency, financial difficulty, financial embarrassment, dishonesty, or fraud, or which are in any other manner prejudicial to them in the way of their employment or trade, are actionable *per se.* Herman v. Bradstreet Co., 19 Mo. App. 227. For instance, to write or print of a man in business, that he has made a fraudulent conveyance, is actionable *per se.* Simmons v. Burnham, 102 Mich. 189; Beardsley v. Tappan, 1 Blatchf. (U. S.) 589; Bentley v. Reynolds, 1 McMull, L. (S. Car.) 16. (3) Even though the words published be held not to be libelous *per se,* if the words are false and special damages are pleaded and proved, as in case at bar, and such damages are of a pecuniary nature, as loss of credit, the plaintiff makes his case and is entitled to go to the jury. Brown v. Smith, 13 C. B. 596,

76 E. C. L. 596; King v. Watts, 8 C. & P. 614; Western Union Tel. Co. v. Pritchett, 108 Ga. 411; Mentze v. Tuteur, 77 Wis. 236; Masters v. Lee, 39 Neb. 574. (4) The mere fact that at the time of the publication, as shown by plaintiff's evidence, the plaintiff had outstanding against him about four thousand dollars indebtedness to his Eastern creditors, said bills not being due for two and three months, and that if he had collected all that was due him from his customers, and applied all of his property at such time to the payment of the said indebtedness, he would not have been able to liquidate his indebtedness in full is no defense to his suit and does not destroy his right of action. To constitute a justification, the precise charge must be justified, and it is not sufficient to offer proof of another charge, though of the same general nature. Dennehy v. O'Connell, 66 Conn. 175; Robertson v. Hamilton, 16 Ind. App. 328; Hallowell v. Guntle, 82 Ind. 554; Downs v. Hawley, 112 Mass. 237; Gardner v. Self, 15 Mo. 480; Palmer v. Haight, 2 Barb. (N. Y.) 210; Andrews v. Vanduzer, 11 Johns. (N. Y.) 38; Hadock v. Naughton, 74 Hun 390; Trimble v. Foster, 87 Mo. 49.

*W. B. Homer* for respondent.

(1) The publication in question cannot be regarded as *per se* libelous. Legg v. Dunleavy, 80 Mo. 562; Nelson v. Musgrave, 10 Mo. 648; Price v. Whiteley, 50 Mo. 439; Minter v. Bradstreet Co., 174 Mo. 485; Spurlock v. Lombard Investment Co., 59 Mo. App. 225. (2) There is nothing in the colloquium showing any facts which would impute any offense to the plaintiff which would make the published words libelous. McManus v. Jackson, 28 Mo. 56; Powell v. Crawford, 107 Mo. 601; Bundy v. Hart, 46 Mo. 464; Christal v. Craig, 80 Mo. 367; Curry v. Collins, 37 Mo. 324. (3) Where words are not libelous on their face, an averment of falsity and malice alone is not sufficient. There must also be an

allegation that such falsity was within the knowledge of the defendant at the time of the publication. 13 Ency. Plead. & P. 59. (4) It appearing from the plaintiff's own statement that he was at the time of the publication absolutely without any means to carry on his business successfully, and was wholly insolvent, he could not have been injured by the publication. Minter v. Bradstreet Co., 174 Mo. 444; Mitchell v. Bradstreet Co., 116 Mo. 240; Weltmer v. Bishop, 171 Mo. 110.

LAMM, J.—Suit for damages for an alleged libelous publication. At the close of plaintiff's case, the court gave an instruction in the nature of a demurrer to the evidence, whereupon plaintiff took a nonsuit with leave. After an unlucky motion to set the nonsuit aside, plaintiff, on proper steps, perfected an appeal and brought his case here.

The paper issues may be formulated thus:

The petition alleges that plaintiff was engaged in selling cigars in St. Louis under the name of A. G. Ukman Cigar Company and in the conduct of his business had established and maintained an excellent credit with the business world at home and abroad. That defendant is a domestic corporation doing business in the city of St. Louis, printing, publishing and circulating among business people generally, including the business men having dealings with plaintiff, a daily paper known as the St. Louis Daily Record, and in an issue of that paper of date, the 3rd of February, 1902, "did utter, publish and circulate, of and concerning the plaintiff, the following false, malicious and libelous words: 'Bills of Sale.——A. G. Ukman, 612 Chestnut, to Miss A. Handshiegel; Cigar Outfit, $1.00'—meaning by said words to charge plaintiff with having transferred his said business and stock of cigars for the nominal consideration of $1 to the person aforesaid."

It was further alleged that defendant distributed said paper, containing said libel, among the business

people aforesaid and they believed the libel to be true and thereby plaintiff had been injured in his business, credit and reputation, and people from whom he had bought cigars stopped them in transit, and persons from whom he had borrowed money or who had given him credit refused to lend him money or give him credit, and persons from whom he wished to buy goods on credit refused to sell him the same, so that, being unable, by reason of defendant's said libel, to pay his creditors the debts he owed, he was compelled on the 21st day of March, 1902, to file a petition in bankruptcy and was damaged in the premises in the sum of $10,000.

The material averments of the amended answer borrowed from the summary formulated by appellant are as follows:

"First. It admitted the defendant to be a corporation, its chief place of business in St. Louis, State of Missouri, and denied each and every other allegation in plaintiff's petition.

"Second. It is alleged that the defendant published a daily newspaper devoted to the publication of the records of the courts of the city of St. Louis; that said paper also sets forth transfers, recorded in the recorder's office in the city of St. Louis; that it is the custom of the recorder of deeds to furnish the defendant memoranda of transfers recorded in said office; that the recorder of deeds will not permit the defendant to take such information from the records, but required the defendant to receive the same from an agent of the recorder of deeds. Said answer further stated that on the 1st day of February, 1902, the said agent furnished to the defendant a memorandum under the heading 'Bills of Sale,' in the following language: 'A. G. Ukman, 612 Chestnut street, to Miss A. Handshiegel, cigar outfit, $1.00.' That on the 3rd day of February, 1902, the defendant published the same, but did not mean to charge the plaintiff with having transferred his business and stock of cigars for the consid-

eration of one dollar, and did not mean to charge that the plaintiff had transferred his business and stock of cigars for any consideration; that as soon as the defendant learned that the consideration stated in the bill of sale was in fact $700 instead of $1, it at once published a correction of said error, under the same heading, with equal prominence for two successive days.

"Third.    Said answer further alleged that the plaintiff did by bill of sale dated the 31st day of January, 1902, convey to Miss A. Handshiegel a certain stock of cigars and cigar fixtures, such as counters, show cases, wall cases, etc., located at 612 Chestnut street, city of St. Louis; that said publication was not libelous and did not injure the plaintiff; that the said cigar business of the plaintiff was conducted by him merely for the purpose of enabling him to sell some old fixtures and at a loss, and that at the time of the alleged publication, the plaintiff was insolvent and in a failing condition, and that said publication could not and did not injure the plaintiff.

"Fourth.    The answer further stated, by way of mitigation of damages, that the business of the plaintiff was undertaken and conducted by him merely for the purpose of enabling the plaintiff to dispose of some old fixtures; business was conducted at a loss; that the plaintiff was in a failing and insolvent condition at the time of the publication and was not injured; that as soon as the defendant learned that the bill of sale was in fact executed, not for a consideration of $1, but for $700, it at once published a correction of said error."

The reply was in usual form.

The facts are as follows:

Ukman, having gathered experience by connection with tobacco concerns for several years, in 1900 commenced business in a venture of his own under the name and style of the A. G. Ukman Cigar Company, with a present capital of $600, and thereafter did a wholesale cigar business, first, at 805 North Fourth

street and then at 409-411 Morgan street.   In November, 1901, he started a retail cigar store at 612 Chestnut, and seems to have moved his wholesale business there and to have conducted it in the rear of that stand.

Prior to starting his retail store, and preparatory thereto, and thereafter, up to and inclusive of December, 1901, he bought goods on credit in the East to the rise of $4,000. It seems the retail store was conducted at a loss during November and December, 1901, and January, 1902, and his evidence was to the effect that the wholesale department (during said period, at least) showed a small monthly increment of profit, say from $75 to $100.   The amount of loss in the retail department is not shown by the record, nor is it shown how the accounts of the two departments were kept in order to arrive at the aforesaid gain.   That is to say, the rents, taxes, licenses, living and other expenses and outgoes are not pointed out or apportioned between the wholesale and retail departments and are wholly left to conjecture.

It is certain from Ukman's testimony that his affairs on February 1, 1902, were radically embarrassed. At what precise time he had approached the brink of insolvency may only be guessed at, but on that day he had fallen over the brink and was entirely insolvent; for he owed over $4,000 mercantile debts in the East and possibly some confidential debts at home and the evidence indicates that he owed some small business debts there also.   He had in assets, as near as we can ascertain, $1,000 of goods and fixtures in his wholesale department, plus the goods and fixtures in his retail department.   On that date he sold his retail store to Miss Handschiegel for $700—half cash in pocket and half on time, the deferred payments being evidenced by paper, subsequently discounted by him and realized on—said transfer being evidenced by a sale bill stating the true consideration and spread of record.   He then moved his

Vol 189 mo—25

wholesale department to the International Bank building, and conducted a wholesale business at that stand until March 21, 1902, when he filed two petitions, one in the Federal court, having for its purpose to be adjudged a bankrupt, his assets administered upon and to be discharged of his debts, and the other, this suit, against respondent for $10,000 damages for libel.

It is admitted in the pleadings, and established by the proof, that respondent on February 3, 1902, printed and published the matter complained of and that it was correct in all details except that the consideration was printed as one dollar, when it should have been $700, and it was shown that three weeks thereafter appellant complained to respondent of the mistake in the publication, and it was at once corrected and published in correct form for two successive days. It was furthermore proved that the Daily Record is a newspaper devoted to the gleaning and publication of facts from the current records, possibly of the courts, but certainly of the records kept by the recorder of deeds of the city of St. Louis, as news, and moreover that it had a list of subscribers of from 1,200 to 1,300 in and about St. Louis who were lawyers, real estate and business men.

Between February 1st and March 21, 1902, appellant sold $700 worth of his remaining goods and was left with a stock valued at $300, and $200 or $300 in uncollected accounts when he went into bankruptcy, claiming and was allowed the stock on hand as exempt, and turning over said accounts to the trustee. At the date of bankruptcy, none of his Eastern indebtedness was due and it all remained unpaid. He had, however, paid off possibly his confidential and personal debts, and all his local business debts except a few small bills, which were overdue and unpaid, to the amount of $200 or $300.

There was no evidence that any cigars were stopped in transit as alleged in the petition. There was evidence that he was refused credit in the East, but

there was no evidence that the Daily Record was circulated there, or that any of his Eastern creditors saw the publication in question or that his line of credit there was weakened thereby. On this head it may be said, in passing, that suits were brought by appellant against Dun's and Bradstreet's mercantile agencies, presumably based on publications made by them affecting his standing in commercial circles at large.

It was shown that appellant bought very little, if any, in St. Louis and it was not shown that his buying credit in St. Louis was affected one way or the other. That he had been in the habit of borrowing small sums from a limited circle of local acquaintances to tide over matters and pay over-due bills, is shown, and also that this custom increased somewhat immediately before the publication in question. And it was testified by appellant that he had applied to some of his local friends after the publication and had been refused credit. Appellant testified he had a line of credit with one Goldman, with one Kaminsky, with one Friedman, with one Graber, with one Alt and with one Garfingle, from whom severally he had borrowed small sums on short time prior to the publication. That a short time after the publication, say two weeks, he tried to borrow from Graber, Alt, Garfingle and Friedman for the purpose of paying debts, but whether he succeeded or not, he does not say.

Called on to explain what had become of his assets, he testified that he was losing money because he could not take the road to sell goods, and that he had fallen behind as much as $1,500 on account of sickness in his family, but when these expenses on account of sickness occurred, the record does not enlighten us. Appellant called Friedman, Alt, Garfingle, and Hiram B. Morse, publisher of the St. Louis Daily Record and president of the respondent company, to the stand.

By Friedman he proved that his credit was very good prior to the 3rd day of February, 1902; that wit-

ness had loaned him at divers times sundry small amounts which had always been promptly repaid; that he had not seen, but had heard of, the publication in question, and, when asked what he understood by the words of the alleged libel, said that he understood by those words "that plaintiff naturally wanted to defraud everybody and he would naturally put it that way to a business man." On cross-examination, witness said he had sold appellant goods on credit and that he "paid nicely right along." Being pressed, however, he admitted he had never sold appellant any goods "directly" but said he had "indirectly." Further pressed, he explained "indirectly" to mean that he had sold goods to appellant's brother. He further stated that he had never heard of "a dollar" consideration when it did not mean that it was the real consideration in a business transaction. That at the times he had made loans to appellant, he had made no inquiries into his financial condition, had taken no security for the loans and that appellant had told him at these times that he had to pay bills and was short of money and was not able to meet his bills and wanted the money until he made collections.

By Alt it was shown that he was appellant's physician. That his credit was good for small sums, that he had advanced him such sums without note or security during the year previous, and had been repaid. That about two weeks after the publication appellant came to witness and inquired if he had any money and witness replied that he didn't have any. On being asked his reason for this reply, his answer was that he had lost confidence in appellant because he had heard that he had sold out for one dollar. On cross-examination witness said that the last loan he had made before February 3, 1902, was $100. That it was a "strict confidential loan accommodation." That he was a friend of Ukman but took no interest from him, made his loans for accommodation, and not "as business at all."

By Garfingle it was shown that appellant's credit was good with witness. That he had loaned him money every three or six months in modest amounts and had taken his unsecured notes which had always been paid on time. That two weeks after the publication appellant tried to borrow $500 of witness, which he refused for the reason that he had seen in the St. Louis Daily Record he had sold out for one dollar and witness thought that appellant wanted to cheat his creditors and had failed. When he saw appellant after the publication, he told him about it and appellant explained to witness that he had sold out for $700, but witness had it in his mind that he did not want to trust him any more; that the idea conveyed to witness's mind by what he read in the Daily Record was that the appellant had failed and had turned over his property so that his creditors could not touch it.

By Hiram B. Morse, among other things, it was proved that he was the business manager and president of respondent company. That he was familiar with the way considerations are stated in deeds and had noticed statements where the consideration was one dollar on many occasions. That when the consideration is stated at one dollar in a bill of sale, witness would understand that the parties do not care to tell what the exact amount was and their reasons for not doing so are as various as the individuals. Witness understood that the one dollar mentioned does not represent the exact value of the goods transferred; had never known an instrument where one dollar was used as the consideration where the value of the goods conveyed was represented as that sum; would not infer that a man was giving away his property simply because the consideration was one dollar; would not understand from such publication that the party selling out was disposing of his property to defraud his creditors, would never understand it that way. This witness further testified that he did not see the publication on the morning it was

published; that his attention was called to it some twenty days later through one Wurtz, connected with respondent's office, whose attention had been called to it by Ukman; and that thereupon the item was republished correctly for two successive days stating the consideration at $700.

As respondent introduced no evidence on its answer, the affirmative allegations appearing therein relating to the custom of the recorder of deeds in furnishing respondent memoranda of transfers recorded in said office and in not permitting respondent to search the records for itself and in requiring respondent to take its information from an agent of the recorder, and that an agent furnished repondent a memorandum under the head of "Bills of Sale" of the exact character published, were not proved.

It will be noted, also, that appellant does not ask for punitive damages, the amount of no smart money demanded being stated separately, as required under section 594, Revised Statutes 1899.

Did the court err in applying the law to the foregoing facts under the issues in the pleadings? We think not, for the following reasons:

Libel cases are *sui generis* in that the gist of Fox's Libel Act, imbedded in our Constitution, sec. 14, art. 2, Bill of Rights, leaves to the jury the issue of libel or no libel; and from this certain peculiar results logically flow and are recognized by the courts, to-wit, that a defendant in a libel suit has two strings to his bow, the one the jury, the other the court, whereas the plaintiff has but one and if he succeed, must win a verdict from the jury. Stated in a different way, if the defendant can get either the court or the jury to be in his favor, he succeeds, while the prosecutor or plaintiff can not succeed unless he gets both the court and the jury to decide for him. From this condition of things it further follows that the court may direct a nonsuit, but cannot coerce a verdict for plaintiff. [Heller v. Puli-

tzer Pub. Co., 153 Mo. 205; Duncan v. Williams, 107 Mo. App. 539; Banks v. Henty, L. R. 7 App. Cas. (H. L.) 741.]

In the case at bar the court forced a nonsuit, and the question here is the correctness of that action of the court.

In considering the matter, certain settled propositions of law may be assumed as postulates, thus:

*First,* a libel differs from a slander in that a publication may be libelous when if spoken orally it would not be slanderous. [Nelson v. Musgrave, 10 Mo. 648; Price v. Whitely, 50 Mo. 439; Herman v. Bradstreet Co., 19 Mo. App. 227; Manget v. O'Neill, 51 Mo. App. 35.] This distinction is said by the books to be based upon the grounds that a vocal utterance does not import the same quality of deliberation and is more prone to be the ebullition of fleeting passion, mere effervescence or lack of mental equipoise and to be accepted as indicative of feeling rather than of conviction, and, therefore, not so much gravity is allowed to it as to words deliberately written down and published, the latter justifying the inference that they are the expression of settled conviction and affect the public mind correspondingly. So, too, an oral charge merely falls upon the ear and the agency of the wrongdoer in inflicting injury comes to an end when his utterance has died on the ear, but not so with the written or printed charge which may pass from hand to hand indefinitely and may renew its youth, so to speak, as a defamation as long as the libel itself remains in existence, and hatch a new crop of slanders to be blown hither and yon like thistle down at every sight of the libel, so that a printed slander, when published, takes a wider and more mischievous range than mere oral defamation and is more reprehensible in the eye of the law. [Cooley on Torts (2 Ed.), 240; Odgers on Lib. and Sl. (2 Ed.), 3; Dexter v. Spear, 4 Mason 115.]

Thus, for instance, to publish of a man that he is

a "skunk" (Massuere v. Dickens, 70 Wis. 83); a "swine" (Solverson v. Peterson, 64 Wis. 198); a "drunkard," a "cuckold," a "tory" (Giles v. State, 6 Ga. 276); "I look on him as a rascal" (Williams v. Karnes, 4 Hump. 9); "an imp of the devil and a cowardly snail" (Price v. Whitely, 50 Mo. 439); that he has been "in collusion with ruffians" (Snyder v. Fulton, 34 Md. 129) —are each and all libelous.

*Second,* not only do words which are slanderous *per se* become libelous *per se* when printed and published, but, because of the distinction between libel and slander heretofore noted, many words which would not be slanderous *per se* become libelous *per se* when printed and published. [Cooley on Torts (2 Ed.), p. 240.]

*Third,* being a commercial people and credit being the lifeblood of commerce, our law has ever had a tender regard for merchants or traders and therefore a false publication impairing the credit of a merchant or trader by importing insolvency, dishonesty or trickery touching their trade or occupation is held libelous *per se,* the malice being supplied by implication of law, and though special damages may be, yet they need not be, alleged and proved. [Newell on Sl. & Lib. (2 Ed.), p. 74; Mitchell v. Bradstreet, 116 Mo. l. c. 239; Minter v. Bradstreet, 174 Mo. l. c. 486.] Thus, for instance, to falsely publish of a brickmaker that "he is in the hands of the sheriff" (Herman v. Bradstreet Co., 19 Mo. App., supra); of a trader that "we know Sullivan very well and firmly believe that he has misinstructed his St. Louis bank here in order to make interest on your money. We sincerely hope for your own good and ours, too, that you will never have any more to do with Sullivan when the business has to come through our hands, as we do not like his business methods, and we are afraid to deal with him" (Sullivan v. Com. Co., 152 Mo. 268); to falsely publish of a commercial firm that it has "assigned" (Mitchell v. Bradstreet Co., 116 Mo. 236); to falsely publish of merchants that "the

opinion is expressed that a local bank has been secur-
ed," and that "their present condition is not regarded
as particularly flattering and seems to suggest cash
dealings" (Minter v. Bradstreet Co., 174 Mo. 444); are
each and all libelous *per se*.

*Fourth*, where the alleged libel is claimed to bear
a hidden or latent meaning which can only appear from
extrinsic circumstances, the complaint should set forth
in prefatory allegations by way of inducement such ex-
trinsic facts and the libelous charge should be followed
by an innuendo applying the words to the matter plead-
ed by way of inducement, and such innuendo should not
be a forced but a reasonable construction and applica-
tion of the words used. [Legg v. Dunleavey, 80 Mo.
558; Townsh. on S. & L. (4 Ed.), sec. 335 et seq.]

For example, in Banks v. Henty, supra, decided by
the House of Lords, H. & Sons, brewers at Chicester,
had a squabble with the manager of a certain bank, and
as a result thereof issued a printed circular to their
tenants and customers, who knew nothing of the squab-
ble, to the effect that they, H. & Sons, would not receive
payments in checks drawn on any branch of the bank,
and where the meaning ascribed to the circular by the
innuendo was "that the plaintiffs were not to be relied
on to meet the checks drawn on them and that their po-
sition was such that they were not to be trusted to cash
checks for their customers." A run was made upon
the bank and it sued H. & Sons for libel. The jury dis-
agreed at the first trial and an issue of law was then
raised as to whether the circular was libelous and
whether, on the pleadings, the court ought not to give
a judgment for defendants, and it was said: "In con-
struing the words to see whether they are a libel the
court, where nothing is alleged to give them an extend-
ed sense, should put that meaning on them which the
words would be understood by ordinary persons to
bear, and say whether the words so understood are cal-
culated to convey an injurious imputation." It was

held that no imputation of a libelous tendency, as for instance, insolvency, could be reasonably inferred from the matter complained of and judgment was given for defendants.

The correct rule in construing words seems to be that they are to be taken not *in mitiori sensu,* but in their fair English meaning. That if the meaning is fairly ambiguous and one allowable meaning is libelous, the case may go to the jury. If, however, the meaning is unambiguous and will not reasonably admit of a libelous construction, the question is for the court. [Odgers on Lib. and Sl. (2 Ed.), 94 et seq.; Newell on Sl. and Lib. (2 Ed.), p. 290, sec. 4.] Applying this latter principle it was held, in Zier v. Hofflin, 33 Minn. 66, that the following was not libelous on its face: "Wanted—E. R. Zier, M. D., to pay a drug bill," and it has been held that the publication of a foreclosure advertisement, under a trust deed that had been satisfied, which advertisement narrated that the bond was past due and unpaid, was not libelous without proof of special damages (Spurlock v. Lombard Inv. Co., 59 Mo. App. 225).

Applying the foregoing principles of law to the pleadings and facts of this case, we see that the words of the news item in hand, in and of themselves, bear no libelous sting or edge. We see further that by way of innuendo it was averred that the words meant that plaintiff had sold his business and stock of cigars for the nominal consideration of one dollar to Miss Handschiegel. Here, it is contended that these words impute insolvency or dishonest trickery in a business way. But by this contention of appellant it is sought to enlarge the meaning of the words, as set forth in the innuendo, which he may not do. [13 Ency. Pl. and Pr., p. 55; Townsh. on S. and L., sec. 338.] If appellant desired to attribute such a meaning to the words, he should have so framed his innuendo. But waiving that, if it be admitted by way of strained construction and

*arguendo* that the words impute insolvency, yet under the evidence appellant was shown to be insolvent at the time of the publication, and the truth is a defense in libel (R. S. 1899, sec. 636), and a charge of insolvency is fully met by proof of the fact. [See Mitchell case, supra, 116 Mo., and the Minter case, supra, 174 Mo.]

Again, if appellant be allowed to go outside his innuendo in attributing a meaning to the words, then do the words by fair construction bear a meaning of a charge of dishonest trickery in a business way? It seems to us not. Many reasons fair on their face might be given for a nominal consideration in a transfer and all of them harmless. For example, if a transaction be a private business dealing, it might be dealt with throughout as such, and the parties thereto not care to advertise the true consideration. Again, a nominal consideration is the usual method of indicating that there are other considerations which are not mentioned —the consideration of a contract being always open to explanation, the expression of a nominal consideration being a sign and notice to all outsiders interested in the transaction that it is not the true one and that inquiry should be made of the contracting parties, if knowledge of the facts be desired. A dealer desiring to defraud his creditors would not naturally blazon the fact abroad that he had sold out for one dollar; for that would be an open invitation to challenge the transfer, so that, to our mind, a charge of fraud or trickery cannot be fairly imputed as a meaning to the item published, and even if the innuendo had been broad enough to include such charge, no damages would likely result to plaintiff from the harsh and unnatural conclusion placed on the publication by those of his intimate friends who testified. The loan of money sought for, if refused on account of the publication, in nowise damaged plaintiff. His business had got beyond help from makeshifts of that sort and the small loans, if consummated, would have only benefited existing creditors and

transferred the ultimate damage, not to plaintiff, but to the confiding friends who continued to trust him in the desperate straits he was in.

Perceiving no error, the judgment is affirmed. All concur, except *Marshall, J.,* not sitting.