## GLOVER C. BRANCH v. PUBLISHERS: GEORGE KNAPP & COMPANY, Appellant.

### Division Two, July 13, 1909.

1. **LIBEL: Matters of Law: Evidence.** The constitutional provision respecting libel suits does not divest the judge of his duty to determine matters of law arising in the case. If proffered evidence is incompetent, it is the duty of the court to exclude it.

2. ———: **Evidence: Witnesses' Understanding of Meaning.** If the words of an article alleged to be libelous are not ambiguous, if their meaning is plain, and according to their natural and ordinary signification in the circumstances attending their publication they do not charge libel, then witnesses should not be permitted to testify what they understood the publication to mean.

3. ———: ———: ———: **Contradicting Court's Instructions by Evidence.** It would be an anomalous legal situation to hold that the court's instruction to the effect that the publication did not charge that plaintiff had been bribed, was correct, and to also hold that witnesses were properly permitted to testify that they understood the publication to charge bribery.

4. ———: **Circumstances.** In determining whether the publication was libelous, it is fair and proper to take into consideration the circumstances surrounding the plaintiff and the defendant at the time of the publication.

5. ———: ———: **Changing Attitude Towards Candidate: Bribery.** Plaintiff, a Representative elect, had carefully concealed from the public whom he would vote for for U. S. Senator. He visited the city and the hotel where one of the candidates was lavishly entertaining members of the General Assembly, and mingled freely with said candidate's friends for two days, and defendant's reporter, knowing his unannounced attitude towards the various candidates, was informed by others that plaintiff had said he could not reconcile his conscience to support the said candidate. Plaintiff returned home and wrote a public letter announcing his support of that candidate. Thereupon that reporter wrote, and defendant published it in its newspaper, an article to the effect that plaintiff had visited the candidate's headquarters, that he was entertained at the candidate's expense at the hotel and theatre, that it was "easy living," that the candidate "then talked," and the plaintiff "bit," and "to make a long story short" plaintiff "reconciled his conscience to the extent of signing a letter pledging his support" to the candidate. *Held*, that the article does not on its face, or by any fair interpretation, charge that plaintiff, for a money consideration or any other corrupt purpose, had concluded to vote for the candidate, but simply states that the candidate's hospitality and lavish attention had induced him to announce his support, and was not libelous and the verdict for plaintiff is reversed.

6. ———: **Criticism of Public Officer.** It is not libelous for a newspaper to point out a seeming inconsistency in the public conduct of a public officer, nor has a public officer any right to complain of just and fair criticism.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis,* Judge.

REVERSED.

*Lehmann & Lehmann* and *Wm. H. Chiles* for appellant.

(1)   The publication was not ambiguous or of doubtful import and evidence of witnesses as to its meaning was therefore improperly received.   Newell on Slander and Libel, 290.   (2)'  The court held the article to be plain and unambiguous and so was bound to declare its meaning as matter of law and erred in submitting it to the jury as a question of fact.   Heller v. Pulitzer Pub. Co., 153 Mo. 205; Ukman v. Daily Record Co., 189 Mo. 378; Vedder v. Fellows, 20 N. Y. 768; Massey v. Tingle, 29 Mo. 437; Harrison v. Hance, 37 Mo. 185.   (3)   Plaintiff's own conduct gave warrant for the comments complained of and the court should have directed a verdict for defendant.   (4)   The verdict is excessive and oppressive in amount.   Chitty v. Railroad, 166 Mo. 435; Newcomb v. Railroad, 182 Mo. 687; Markey v. Railroad, 185 Mo. 348; Phippin v. Railroad, 196 Mo. 321; Stolze v. Railroad, 188 Mo. 581; Reynolds v. Railroad, 189 Mo. 408; Devoy v. Railroad, 192 Mo. 197.

*Reed, Yates, Mastin & Harvey* and *Horace F. Blackwell* for respondent.

(1)   The language of the publication was ambiguous and susceptible of a double meaning, and evidence of witnesses as to what they understood the article to mean was properly received.   Julian v. Kansas City Star Co., 209 Mo. 35; Newell on Slander and Libel, p. 311; Starkie on Slander and Libel (5 Ed.), p. 466; Odgers on Libel and Slander (4 Ed.), pp. 538, 634; Townsend on Slander, secs. 140, 384; 2 Greenleaf on Evidence, sec. 417; Nelson v. Borchenius, 52 Ill. 236; Smart v. Blanchard, 42 N. H. 146; Goldsborough v. Oren & Johnson, 103 Md. 671; Caruth v. Richeson, 96 Mo. 190; McGinnis v. Knapp, 109 Mo. 141;

St. James Military Academy v. Gaiser, 125 Mo. 526; Ukman v. Daily Record Co., 189 Mo. 394; Wagner v. Printing Co., 45 Mo. App. 13; Knapp v. Fuller, 55 Vt. 311; Lewis v. Humphreys, 64 Mo. App. 470; Buford v. Young, 115 Ind. 175; Burton v. Holmes, 16 Iowa 264; State v. Fitzgerald, 20 Mo. App. 382; Israel v. Israel, 109 Mo. App. 382. (2) The court did not hold the article to be plain and susceptible of only one construction, and committed no error in submitting the meaning to the jury as a question of fact. Authorities cited under point I. (3) Plaintiff's conduct gave no warrant for the article sued on, and the court committed no error in not directing a verdict for the defendant. Julian v. Kansas City Star Co., 209 Mo. 35. (4) The verdict is not excessive. Longan v. Weltmer, 180 Mo. 322; Minter v. Bradstreet Co., 174 Mo. 444; Meriwether v. George Knapp & Co., 120 Mo. App. 392; Harrison v. Lakenan, 189 Mo. 581; Drake v. Kansas City, 190 Mo. 370; Fallenstein v. Boothe, 13 Mo. 427; Fullerton v. Fordyce, 114 Mo. 519; Cambron v. Railroad, 165 Mo. 543; Copeland v. Railroad, 175 Mo. 650; Scullin v. Railroad, 184 Mo. 695; Stotler v. Railroad, 200 Mo. 107; Julian v. Kansas City Star Co., 209 Mo. 35; Brown v. Globe Printing Co., 112 S. W. 462; Brown v. Publishers: George Knapp & Co., 112 S. W. 474.

GANTT, P. J.—This is a suit for libel.

The petition states that the plaintiff is a citizen of Missouri, and a resident of Lafayette county. The defendant is a corporation of Missouri engaged in publishing a daily newspaper known as "The St. Louis Republic," which has a large daily circulation throughout the State of Missouri and other States of the Union and in foreign countries. That at the regular November election held in November, 1904, plaintiff was elected Representative of Lafayette county to the

General Assembly of Missouri on the Republican ticket, and that he has since duly qualified and taken and now holds said office. That one of the matters to come before the General Assembly at its said session to be held in the month of January, 1905, was the election of a United States Senator to succeed Senator Cockrell. That prior to the publication of the article complained of, a number of men, among whom was Richard C. Kerens, were publicly aspiring to said office and were seeking to secure the support therefor of the Republican members elect to said General Assembly; that prior to the publication of the article complained of, it had been charged in various newspapers that efforts were being made, by the use of money and by other improper means, to influence the choice for United States Senator of said members of the Legislature elect. That until the publication of the article herein complained of plaintiff possessed a large number of personal friends and acquaintances in said county of Lafayette and throughout the State of Missouri and was generally esteemed as a good citizen and as an honest man, and that plaintiff bore and had always borne a good reputation in the matters aforesaid. That defendant, well knowing the facts aforesaid and intending and contriving wickedly and maliciously to injure plaintiff in his good name, fame and credit, and to bring him into public scandal, infamy and disgrace with and among his neighbors and other good and worthy citizens, and with the general public of the State of Missouri, and to cause it to be suspected and believed that he, the said plaintiff, was a member elect of the Legislature of the State of Missouri and that as such he had accepted and received gifts, considerations, gratuities and rewards under an agreement that his vote, opinion, judgment and decision should be given in favor of the said Richard C. Kerens for United States Senator in the election for United States Senator to be held by the General As-

sembly, and that because of said gifts and rewards, he, the said plaintiff, had agreed to vote for the said Richard C. Kerens, for the office of United States Senator at said election so to be holden, and, further, to cause it to be suspected and believed that he, the said plaintiff, had disregarded his conscience and intended to vote against his conscience because of favors received and improper and illegal considerations given and granted in favor of the said Kerens, and further, to cause it to be suspected and believed that plaintiff had bartered away his honor, and that he was a man without honor and that he was a man who was not guided by his conscience or controlled by his duty as a public officer and that he had disregarded his duty as a public officer and that he had accepted favors of an improper character from said Kerens, and further, to cause it to be believed that plaintiff was dishonest and corrupt and a venal public officer and that he had committed a crime in the manner aforesaid of accepting bribes and was liable to imprisonment in the penitentiary for a term not to exceed seven years, well knowing that the said charges were untrue, did on Wednesday, December 14th, 1904 falsely, wickedly and maliciously compose, print, publish and procure to be published in its newspaper, "The St. Louis Republic," in and through Lafayette county and all the other counties of this State and in various States and territories of the Union and through foreign countries, the following false, malicious, defamatory and libelous article, to-wit:

"BRANCH EASES CONSCIENCE.

"The publication of letters from Representative-elect Branch and Cook of Howell and the announcement that Brown of Grundy would vote for Kerens especially serves for many explanations.

"Branch of Lafayette has made two visits to St. Louis since the election. The first time he was presented to Senator Elkins of West Virginia, who, it is

said, asked him very solicitously for his vote. Mr. Kerens himself previously, according to the story which he told to his friends, had opened proceedings by asking him if he could use any transportation or whether he wanted an office. Mr. Branch did not.

"Branch did not see the light at that visit. Last Friday he returned. The next morning he called at the Kerens headquarters. 'Glad to see you, Mr. Branch,' said Mr. Kerens to him, in a most charming manner. 'I want to talk to you about this senatorship, but I am very busy to-day and can't you stay over until to-morrow? I have a vacant room here and you might just as well sleep there to-night. It won't cost you a cent.'

"Branch demurred. He had told some of his friends just before going to the Planters that he 'didn't see how he could reconcile his conscience to vote for Kerens.' But the Representative-elect of Lafayette county 'bit.' He stayed over night. Even the next day Kerens was too busy to talk to him. Another night at the Planters and the theatre. It was easy living. Then Colonel Kerens talked. And to make a long story short, Branch of Lafayette 'reconciled his conscience' to the extent of signing a letter pledging his support to Kerens. He then went home."

Meaning thereby and intending to mean and the readers of said newspaper would understand said article to mean that plaintiff was a member elect of the Legislature and a public officer and that he had declared that he did not see how he could reconcile his conscience to vote for Richard C. Kerens for the United States Senate, but that he had visited the said Richard C. Kerens at the Planters Hotel in St. Louis and that there he had been entertained at the expense of the said Richard C. Kerens. That he had visited the theatre at his expense while at said hotel, and that he, the said plaintiff, had stayed at said hotel for two days and accepted the gifts, considerations and gratui-

ties from the said Richard C. Kerens and that in con-
sideration thereof had promised and agreed to give
his vote, as a member of the General Assembly, in fa-
vor of the said Richard C. Kerens for United States
Senator and, further, meaning and intending to mean
and the readers of the newspaper article would under-
stand it to mean that plaintiff had accepted and re-
ceived bribes and that he had laid aside his conscience
and had wilfully and corruptly because of said bribes,
gratuities and gifts agreed to cast his vote in favor
of the said Richard C. Kerens for United States Sen-
ator from the State of Missouri, and further meaning
and intending to mean and the readers of said news-
paper article would understand it to mean that plain-
tiff had been guilty of the crime of accepting bribes
and was liable to be imprisoned in the penitentiary for
a term not to exceed seven years.

And further meaning and intending to mean and
the readers of said newspaper article would under-
stand it to mean that plaintiff was a man without hon-
or, and that he had bartered away his conscience.
That he had agreed for a corrupt and improper con-
sideration to cast his vote in favor of a man for United
States Senator whom he knew it was against good
conscience to vote for, and further meaning and in-
tending to mean and the readers of the said newspaper
article would understand it to mean that plaintiff was
not guided by duty but that he was controlled by cor-
rupt means and that he was a purchasable man and
a man who could not be trusted as a public officer, and
that he had betrayed his trust as a member of the
Legislature.

Plaintiff says that said article was untrue and
that each allegation thereof was untrue and that the
defendant well knew at the time of the publication
thereof that the same was untrue, and that said article
was maliciously and wickedly contrived for the pur-
pose of injuring the plaintiff in his good name and

reputation and to vex, oppress, destroy and impover-
ish him, the said plaintiff.

The damages were laid at twenty-five thousand
dollars actual damages, and twenty-five thousand dol-
lars exemplary or punitive damages.

On April third, 1905, defendant filed a motion to
dismiss the cause for want of jurisdiction, which mo-
tion was overruled June 7th, 1905, and defendant filed
its bill of exceptions.

The defendant then filed an answer, the first count
of which was a plea in abatement to the jurisdiction
of the circuit court of Lafayette county, and as the
second defense it admitted that it published its said
newspaper on December 14th, 1904, in the city of St.
Louis, but denied each and every other allegation in
the petition contained, and for a further defense to
said petition, the defendant alleged that at the time
complained of there was pending in the State of Mis-
souri the matter of the election of a United States Sen-
ator to succeed the Honorable Francis M. Cockrell, ·
whose term was about to expire. That one R. C. Ker-
ens was a candidate for said office. That there was
being maintained. by or for the said Kerens, as such
candidate, a lavish hospitality at the Planters House,
a hotel in the city of St. Louis. That the plaintiff,
being a member elect of the General Assembly of the
State of Missouri, came to the city of St. Louis and
did pay several visits to the rooms of the said Kerens
in the said Planters House. That the plaintiff had
stated to divers persons that he could not vote for the
said Kerens. That after visiting the said Kerens's
rooms or quarters, and enjoying his hospitality, the
plaintiff announced himself as a supporter of said
Kerens, and the defendant made the publication com-
plained of as a publication of these facts and as legiti-
mate comment thereon, being a matter of public inter·
est which it was its right and duty to discuss and to
present to the public, who were entitled to know all

the acts and doings of the candidates for the office of
Senator and of the members of the Legislature who
were charged with the duty of electing such Senator.

For further defense to said petition, the defend-
ant alleges that upon and prior to his first coming to
the city of St. Louis in connection with said senatorial
candidacy, the plaintiff announced to various persons,
and in unqualified terms, that he could not bring him-
self to support the said Kerens for the office of United
States Senator, and his position and statements in
this respect were matters of common report in the
said city of St. Louis. That said Kerens was a man
who had long participated in politics of Missouri and
was well known to the public men of the State, and
the matter of his qualifications for the office of Sena-
tor was and long had been well understood by them.
That after several visits to the headquarters of the
said Kerens, the said plaintiff changed his attitude
and announced himself as a supporter of the said
Kerens, and thereby caused it to be believed, and de-
fendant did believe, that the attentions and hospitali-
ties of the said Kerens and his supporters had caused
such change of attitude on the part of said plaintiff
and, so believing, the defendant published the said
article as aforesaid, without malice and as a matter
of news of great public interest and importance.
Wherefore, having fully answered, defendant prays to
be hence dismissed with its costs.

To this answer the plaintiff filed a reply in the
nature of a general denial of the allegations of the
answer.

The evidence of the plaintiff was to the effect that
the capital stock of the defendant company is five
hundred thousand dollars and is worth more than
par. The circulation of the paper in December, 1904,
was approximately 100,000 daily, and extended to the
various counties of this State and other States. Sixty
or seventy copies were circulated in the town of Lex-

ington. Various residents of Lafayette county tes-
tified that they had read the article complained of.
These same persons, over the objections of the defend-
ant, testified as to their understanding of the meaning
of the article. Some to the effect that the article
charged Mr. Branch with having received a bribe and
others that it charged him with having been influenced
by Mr. Kerens's hospitality.

Plaintiff testified that in November and again in
the early part of December, 1904, he was in St. Louis
and was at the Kerens and Niedringhaus headquarters
at different times. His stopping place was at the La-
clede Hotel, and he paid his bills there. In this he
was corroborated by Mr. Pritchett, the clerk of the
hotel. At this time he accepted a dinner invitation
from Alex. Niedringhaus, the brother of Thomas K.
Niedringhaus, the latter being a candidate for United
States Senator, but he accepted no hospitality at the
hands of Mr. Kerens or from any person for him. He
did not tell Mr. Alex. Niedringhaus that Kerens
had offered him transportation or that he could not
reconcile his conscience to vote for Kerens. He did
not think that he had any knowledge of telling Mr.
Madison or Mr. Van Trump that Mr. Kerens had told
Mr. Elkins that he, Branch, was a man after his own
heart and would vote for him without any solicitation,
and that he, Branch, told Kerens that he was running
too fast, not to push him along, or words to that ef-
fect. During his canvass for the office of Represen-
tative he was not committed to anyone for United
States Senator. His mind was not made up. He so
told Mr. Madison on the way to St. Louis in the latter
part of November. In fact he had made up his mind.
He was asked by a great many who his preference was
for Senator, and he told them that he had not made
up his mind whom he would support. He was going
by Mr. Welborn's instructions. Mr. Welborn was his
Congressman and had asked him not to commit himself

openly. He told the Kerens people privately that he was with them, but not ready to commit himself openly. On his visits to St. Louis he told Mr. Akins and others who opposed Kerens that he was not ready to commit himself. Immediately on his return from St. Louis in December, he wrote the letter committing himself to Kerens. This letter was published on December 13th, and on the 14th appeared the article, which is the foundation of this suit. After this article was published, it was generally shoved at him wherever he went and they did not accept him as a boarder in Jefferson City, until they had investigated his character. Some people would stop him and say they understood that he had sold out and say, ''I guess you will buy lots of farms and get into a big business.'' His banker, Mr. Walter Waddell, and his neighbors Mr. Gratz and Mr. Carter, said they believed the piece.

An editorial published in the Republic of December 5, 1904, entitled ''Reprehensible Campaigning,'' was admitted in evidence over the objection of the defendant. That article did not name any senatorial candidate, but condemned as a reprehensible business the procuring of editorial endorsements for a money or any other consideration.

On the part of the defendant the evidence tended to show that T. K. Niedringhaus was a candidate for United States Senator in 1904. His brother Alex. Niedringhaus testified that Branch came to see him about Thanksgiving, 1904, told him he had not made up his mind on the question of Senator, but that he had met Kerens and Elkins a short time before, and that Kerens had introduced Branch to Elkins, and told him that Branch was a man after his own heart, and was going to vote for him for Senator. Branch said he had not said that; he told Kerens that he was going too fast; not to shove. He saw Branch also the same day and asked him who he would support for Senator and Branch said he did not know, but his

conscience would not permit him to vote for Kerens. He also said he was afraid to go back to Kerens's headquarters because Kerens had made it so attractive for him there.

Van Trump testified that he heard part of the conversation between Branch and Madison and heard Branch say he told Kerens he was going too fast.

C. C. Madison testified he met Branch by appointment and they went together to the Niedringhaus headquarters. Here Branch detailed his conversation with Kerens at the time he was introduced to Senator Elkins, when Kerens told Elkins that Branch had come out for him, and Branch told him he was going too fast.

Akins testified that Branch came to see him in November, 1904, and he tried to get him to support Parker, but Branch would not commit himself; said he was looking over the ground.

E. L. Morse was one of the Kerens managers at the Planters House. They had from six to eight rooms at the top floor of the Planters, and a part of the time fifteen or twenty. He saw Branch there about Thanksgiving and again about the 10th of December. Branch did not take dinner there then. Later about the 13th or 14th, after he had come out for Kerens, Branch was there for several days. Some twenty or twenty-five members of the Legislature were guests of Kerens.

Thomas Marks was another Kerens manager and was at the Planters. At times there were fifteen or twenty guests sleeping at headquarters. Col. Kerens was "a hospitable sort of chap," he was hospitable to every one. He would ask them to stay to dinner and they had cigars for everybody and made up theatre parties; we were doing the best we could to advance the Colonel's interest in any proper way. Kerens paid the bills.

P. E. Burton testified that he is now an editor in Joplin, was formerly a reporter of the Republic and was on the Republic in December, 1904; he wrote the article complained of. The part of the article referring to Branch appeared only in the fast mail edition of the Republic. It was crowded out of the city edition. Witness learned from other reporters and Alex. Niedringhaus that Kerens took members of the Legislature to theatre parties, and entertained them in other ways. Alex. Niedringhaus and Van Trump' told witness Branch had said he could not reconcile his conscience to vote for Kerens. Swanger had tried to get Burton to go into partnership with him and buy the Springfield Republican; Kerens said he could get the newspaper for him, Swanger, if he would support him (Kerens) for the Senate. Swanger refused the proposition. A. P. Murphy told Burton of efforts of Kerens to get Murphy to support him for the Senate. Offered Murphy one thousand dollars for several days' expenses if Murphy would support him; Murphy declined the offer. Burton was not moved by malice or ill-will. He wrote the article in question as a matter of political news. It was not his purpose to charge bribery. The expression "seeing the light" is used with regard to any one who changes his opinion. The witness is a Republican in politics and is now the editor of a newspaper at Joplin. The Republic was for General Cockrell for Senator. As between the Republican candidates they favored no one, but were opposed to Kerens. Burton saw Branch about the Planters several times prior to the publication in question.

Van Trump, recalled for cross-examination, said Branch did not state in any conversation with him and Alex. Niedringhaus that his conscience would not permit him to vote for Kerens, and he did not tell Burton that Branch had so stated.

Plaintiff testified in rebuttal that he did not tell either Alex. Niedringhaus or Van Trump that he could not reconcile his conscience to vote for Kerens, and he did not tell Niedringhaus that he was afaid to go back to Kerens because they made it so attractive to him.

The jury returned a verdict for the plaintiff for twelve thousand and five hundred dollars. The defendant in due time filed its motions for a new trial and in arrest of judgment, which were overruled, and thereupon an appeal was taken by the defendant to this court.

I. The first assignment of error is that the circuit court of Lafayette county was without jurisdiction of this case, because, as it is alleged, the defendant did not publish the alleged libel in Lafayette county and did not have an office or place of business for the transaction of any business in said county. The learned counsel for the defendant concede that this point was decided adversely to their contention in Julian v. The Kansas City Star Company, 209 Mo. 35, but they reserve the point in this case for the reason that the Julian case has not yet been decided by the Supreme Court of the United States, to which it was appealed. We are entirely satisfied with the conclusion reached in the Julian case by the Court in Banc and hence this point is ruled against the defendant upon the authority of that case.

II. By far the most serious point raised on this appeal is as to the admissibility of the testimony of the witnesses on behalf of the plaintiff as to the meaning of the alleged libelous article, which forms the basis of this case. In Julian's case it was said by this Court in Banc: "On the question of the admissibility of evidence of that kind, the authorities are not entirely uniform. They all agree to this extent, viz:

if the words are ambiguous, or if under the conditions and circumstances in which they are used, they are susceptible of a double meaning, the question as to whether they were used in one sense or the other is a question for the jury. And the authorities also agree that testimony showing the particular conditions and circumstances which are thought to give the peculiar meaning is competent, but whether or not after those conditions and circumstances are shown a witness should be allowed to testify as to what he understood the words to mean when he heard or read them there is a difference of opinion.'' In that case it was held that the expression, ''Julian is remembered here as a member of the Legislature *who did well in a legislative way,* but also, as Stone's chief of police of whom a Democratic Senate committee said, 'He is not the proper man for the position,' '' was sufficiently ambiguous in its meaning to justify the circuit court in submitting such testimony to the jury for interpretation. If this evidence in this case was admissible at all, it must have been upon the ground that the language of the article published by the defendant was ambiguous, and such is the contention of the counsel for plaintiff. It is insisted by the plaintiff that while the article does not in express terms charge the plaintiff with agreeing to vote for Mr. Kerens for a cash consideration, it did nevertheless convey the idea or impression that plaintiff had agreed to vote for Mr. Kerens for some reason other than one which ought to have actuated a member of the Legislature who was honestly and conscientiously trying to discharge the duty he owed himself and his people. The words which seem to the plaintiff to impute to him a sinister motive were the headlines, ''Branch Eases Conscience;'' and the words, ''Did not see the light;'' ''Bit,'' and, ''Reconciled his conscience.'' The circuit court directed the jury that this article did not charge the plaintiff with having accepted a money bribe from

R. C. Kerens for his support of the said Kerens for the Senate, and that in determining whether or not the publication was libelous the jury were not to consider it as making a charge of bribery; in so doing, we think the court correctly interpreted the article. There was no hint of money being used to obtain the vote of plaintiff anywhere in the article. There was no charge of bribery directly or indirectly, and no ground for construction or interpretation of the article upon that theory. When this evidence was first offered as to how this article was understood by the witnesses who read it, the court sustained the objection to the testimony, but later on permitted witnesses to give their understanding of the testimony; thus, Judge Chinn testified that he understood the article to mean that plaintiff had been offered and had accepted a valuable consideration from Mr. Kerens by reason of which he changed his vote from Niedringhaus to Kerens. On cross-examination he stated that he understood the article to be that plaintiff had gotten boodle or *corrupt money*. Mr. W. B. Ming testified that he considered the article a reflection upon Mr. Branch's political integrity, that he had changed his vote and that for a consideration, he would not say for a money consideration, but a consideration of *pecuniary* value. Other witnesses testified to practically the same effect.

The contention of the defendant is that the language is perfectly plain and unambiguous and that there was no ground for admitting this testimony of these witnesses as to their understanding of what the article meant.

This court has settled that the constitutional provision respecting libel suits does not divest the judge of his duty to determine matters of law arising in the case, just as in any other case. In Heller v. The Pulitzer Publishing Company, 153 Mo. 205, this court said: "Thus, in the first instance, upon demurrer or

plea interposed by the defendant, the court decides
the question of libel or no libel. If the decision is for
the defendant, the matter ends as to that court, but if
it is against the defendant the case must go to the
jury upon the question of libel or no libel, the court
directing the jury as to the general principles of law
touching libel, but the jury are at liberty to follow
their directions or not, and if the jury find for the de-
fendant, the case ends there as to that court, but if
the jury find against the defendant a motion in arrest
by the defendant will lie in the same manner it would
have done before the passage of the act." [Ukman v.
The Daily Record, 189 Mo. 391, 392.] So that if this
evidence was incompetent it was under our decisions
the duty of the court to exclude it, just as if it were
incompetent evidence in any other case.

As we understand the opinion in the Julian case,
if the words of an article are not ambiguous, if their
meaning is plain, and according to their natural and
ordinary significance in the circumstances attending
their publication they do not charge a libel, then the
testimony of witnesses as to their understanding of
the meaning of such article is not admissible. In the
Julian case the testimony was received on the ground
that the language of the publication was ambiguous
or double in its significance and that view was stren-
uously combated by the minority of the court. Adher-
ing as we do to the majority opinion in that case, the
question still recurs, was the article upon which this
action for libel is predicated so ambiguous or double
in its meaning that it was competent to admit the tes-
timony of witnesses as to their understanding of its
meaning? Before proceeding to a critical examina-
tion of the article itself, we may premise that the ad-
mission of this evidence had produced a most anoma-
lous condition of affairs from a legal standpoint, to-
wit, the circuit court authoritatively instructing and
advising the jury that the said publication complained

of does not charge the plaintiff with having received a money bribe from R. C. Kerens for his support for the office of United States Senator, and in determining whether or not the publication was libelous the jury were not to consider it as making a charge of bribery, and yet the court permitted Judge Chinn and other witnesses to testify to the jury that he understood it to mean that *plaintiff had gotten boodle or corrupt money* to change his vote from Niedringhaus to Kerens, and thus the jury, who were to determine whether this was libel or not, were left to prefer the interpretation of this article by these witnesses who read it, to the construction which the court itself put upon it. It is obvious, we think, that any system of judicial investigation which leads to such a conclusion as the above, is contrary to all of our conceptions of the prerogative of the judge in directing a jury on all questions of law. If we are right in holding that previous decisions of this court in Heller v. Pulitzer Publishing Company, 153 Mo. 205, and Ukman v. The Daily Record, 189 Mo. 378, uphold the power of a judge in a libel case to determine all matters of law arising in the case in an action for libel, as well as in any other case, then unquestionably it was the duty of the circuit court, if he was of the opinion that the article in question did not charge the plaintiff with bribery, to so instruct the jury, and he erred in receiving the testimony of witnesses, which directly contradicted the instructions which he gave to the jury. As said by this court in Julian v. Kansas City Star Co., 209 Mo. l. c. 79, "It will be noticed that the authorities above quoted consider the subject of the interpretation of the alleged defamatory words under three heads: first, words that are not ambiguous or double in their meaning; second, words on their face susceptible of more than one meaning; third, words innocent in themselves, but which derive an offensive meaning because of certain conditions and circumstances under which

they were uttered. *In the first* there is no question for the jury (at least in the sense of its being a question of fact).'' So that the circuit court having determined in its own mind that the language of this article was not susceptible of a charge of bribery, the court in our opinion erred in permitting the witnesses to state their understanding of the article to be that it did charge the plaintiff with having received boodle or corrupt money to change his vote from Niedringhaus to Kerens.

The learned counsel for the plaintiff in their brief say, ''No one can read the article here sued on without being convinced that while the writer did not in express terms charge the plaintiff with agreeing to vote for R. C. Kerens for Senator for a *cash* consideration, he did nevertheless seek to convey the idea or impression that the plaintiff had agreed to vote for Kerens for *some reason other than a reason* which ought to actuate a member of the Legislature who was honestly and conscientiously trying to discharge a duty he owed to himself and to his people.''

Having reached the same conclusion that the circuit court did, that the article did not charge bribery of the plaintiff, was it libelous notwithstanding it did not charge him with having received a money bribe? The court instructed the jury that the publication did not charge plaintiff with having received a money bribe from Kerens for his support of Kerens for United States Senator, but charged in substance that the plaintiff was by the hospitality, attentions and solicitations of said Kerens induced to give him his support, although plaintiff had previously said he could not reconcile his conscience to vote for Kerens, and if the jury believed that the defendant's reporter, who wrote the article, was induced by the conduct of plaintiff to believe that the publication was true in substance, and that the conduct of plaintiff was fairly and reasonably calculated to induce such belief, and

so believing the reporter wrote and published said article without malice and as a proper piece of information for the public, the verdict should be for the defendant. In determining whether the article was libelous, it is fair and proper to take into consideration the circumstances surrounding the plaintiff and the defendant at the time of the said publication. Now as disclosed by the record, there was a general election in Missouri in the early days of November, 1904, at which members of the General Assembly were elected, who were to elect a United States Senator. The Republicans had a majority on joint ballot in the Legislature. By Thanksgiving day Mr. Kerens had opened headquarters in St. Louis from which to promote his candidacy for United States Senator. He had several managers, among whom were James E. Goodrich, E. L. Morse and Thomas R. Marks. He had five rooms regularly assigned to him at the Planters House in St. Louis, and more when wanted. He kept what might be termed ''open house'' at the Planters and visitors from all parts of the State were generously entertained and looked after. Fifteen or twenty people at a time ate there and were furnished rooms and cigars at the expense of Mr. Kerens. In the evening, it seems there were theatre parties, and this was kept up until the Legislature convened at the Capital. The plaintiff was a member elect of the General Assembly and a Republican in politics. According to his testimony, even before his election, he had determined, if elected, to vote for Mr. Kerens. ''I knew I would vote for Kerens if I was elected.'' And yet, when he was asked, as he admits, by various persons, including members of his own political party, whom he would vote for, he answered always that he was not committed to any one and that he had not decided what he would do. He was pursuing this course, he says, under directions from Mr. Welborn, the Republican Congressman from plaintiff's Congressional district.

After his election he visited St. Louis on two occasions; first, in November, and again in the early part of December. He stopped at the Laclede Hotel and paid his bills there. He testified that he was at the Kerens and Niedringhaus headquarters at different times. He accepted a dinner invitation from Alex. Niedringhaus, the brother of Thomas K. Niedringhaus, one of the candidates for the Senate, but accepted no hospitality at the hands of Kerens. He says he told Mr. Niedringhaus he would not commit himself at all at that time, but told Mr. Kerens that while he was personally for him he would not commit himself to him at that time because he wanted to see if public sentiment at home would back him. He did not want to go against his constituents. He told Mr. Madison that it was none of his business what he was going to do, and he told Mr. Akins, the National committeeman, that he was not ready to commit himself. Indeed, he was evasive to everybody except Mr. Kerens and the Kerens managers. By the public generally, it was understood that he had not made up his mind as to whom he would support for the Senate. When he came to St. Louis he was often at the Planters House mingling with the guests at Mr. Kerens's headquarters. He was fully advised as to the nature of the campaign which Mr. Kerens was conducting. On this subject he says: "I saw what they were trying to do; when I got down and saw what they were trying to do, I made up my mind to come out for him [Kerens] publicly." The defendant newspaper could only know what plaintiff announced for the public ear, and that was that he had not made up his mind and wished to consult with his constituents. Kerens and his hospitality (and to what extent he shared it, the public could not know), were the only things apparently that could intervene between a mind that was not made up, and one that had become absolutely fixed. These appearances were created by the plain-

tiff himself. Obviously, if the plaintiff had been as frank with the public as he was with Kerens and his managers, he would not have invited the criticism contained in the article. On the surface of things, by the impression created by his own assertions, the public generally were given to understand that he had not been able to make up his mind as to how he would vote for United States Senator. In this apparent state of mind he had gone to St. Louis, and while he said he did not accept any pecuniary hospitality from Mr. Kerens or his managers, he did mingle frequently with Mr. Kerens's friends at the Planters House, but, as defendant had been informed, had stated that he could not reconcile his conscience to vote for Kerens. In a short time, or in a few days at least, after having met Mr. Kerens and mingled with his managers at the headquarters at the Planters House, he came out in an open letter pledging his support to Mr. Kerens, so that the defendant and its correspondent and others, who were watching the political situation, drew the conclusion that plaintiff had made up his mind in St. Louis, to support Mr. Kerens, and that he had been induced to do so by Mr. Kerens's solicitations and hospitality, and the conduct of the plaintiff was fairly and reasonably calculated to induce this belief, and this is the whole purport of the article on which this libel is based. Read in the light of the circumstances surrounding the parties and in view of the political contest at that time going on for United States Senator; in view of the letter which had just been published the day before, in which plaintiff pledged himself to support Kerens, we are unable to discover anything in this article further than an attempt to explain when, and where, and how, plaintiff became converted from his indecision as to his vote, to an absolute purpose to vote for Kerens.

We are unable to find any charge of corruption of plaintiff by Mr. Kerens, or anything smacking of a

bribe; on the contrary, a fair summing up of the whole article amounts to nothing more than this, that plaintiff by the hospitable attentions and solicitations of Mr. Kerens had been induced to declare himself as one of his adherents, and to announce that he would vote for him, although the public had previously been informed that he had said he could not reconcile his conscience to vote for Kerens.

In our opinion there was nothing in this article that was libelous within the meaning of our law as to what constitutes a libel. While the plaintiff contends that notwithstanding this article does not charge that he was induced to agree to vote for Mr. Kerens for a *cash* consideration, yet, he contends that the article sought to create the impression that plaintiff had agreed to do so, for some other reason, one which ought not to have actuated a member of the Legislature, who was trying to discharge the duty he owed himself as well as to his people, but what that reason was is not stated in any concrete form so that we may be able to determine that it would be libelous to ascribe it to the plaintiff.

The plaintiff was a public officer. The article related to his action as such, to-wit, his vote for United States Senator, and as such was subject to a fair criticism by the newspaper press. It is not libelous merely to point out a seeming inconsistency in a public officer, and while our laws rigidly protect the private character of the citizen, the acts of a public officer are fairly open to criticism and comment. No honest officer has any right to complain of just and fair criticism, and when the article in question is read in the light of the then surrounding circumstances, it is nothing more than a comment upon the conduct of plaintiff in making a change of position in the senatorship from what the public had been led to believe it had been up to the time his letter endorsing Mr. Kerens was published. While there are certain slang

words used, there is no pretense that they imported any corrupt conduct on his part. Indeed but for the incompetent testimony as to the meaning of the article, we cannot conceive of the jury rendering the verdict they did in this case. In our opinion the article did not charge bribery, it was not ambiguous, but was merely a statement of the circumstances attending plaintiff's announcement of his intention to support Mr. Kerens and a change from his announced position on the senatorial question prior to that time, and in our opinion was the subject of fair and just criticism of official conduct and did not amount to a libel.

Having come to this conclusion, it is unnecessary to discuss other propositions advanced for a reversal of the judgment. The judgment is reversed.

*Burgess* and *Fox, JJ.,* concur.