## SAM B. COOK v. PULITZER PUBLISHING COM-PANY, Appellant.

Division Two, March 21, 1912.

1. **DEMURRER: Waived by Thereafter Offering Evidence.** Defendant's demurrer asked at the close of plaintiff's evidence is waived by offering evidence in support of its answer at the close of plaintiff's case and after its demurrer has been overruled. If at the close of all the evidence such demurrer is renewed, it will be considered on appeal, but will be viewed in the light of all the evidence in the case.

2. ————: **Libel: Practice Commended.** In libel and slander cases the practice is recognized and commended of challenging the sufficiency of plaintiff's case, as to the law and the evidence, by an instruction in the nature of a demurrer.

3. **LIBEL: Demurrer: No Express Imputation of Crime: Per Se Libelous.** The absence from the publication of an imputation of crime does not necessarily render the publication non-libelous *per se*. If it does impute crime it is libelous *per se*, and an instruction in the nature of a demurrer, so far as it challenges the sufficiency of the petition, is correctly refused.

4. ————: **Pleading: Crime: Necessity for Innuendo.** If a publication directly imputes crime it is libelous *per se*, and in such case it is not necessary, in the statement of a cause of action, to plead any extrinsic facts as inducement or to add an innuendo as to its defamatory meaning. On the other hand, if the publication is libelous *per se* as imputing crime, but extrinsic facts are necessary to bring out the defamatory meaning, then the law requires the allegation of such facts as inducement, in order that the actionable character of the words may appear.

5. ————: ————: ————: **No Imputation of Official Misconduct: Not Alleged to be Wilful or Malicious: Sufficiency of Petition in this Case.** The plaintiff was Secretary of State, and as such officer had authority to examine banks and prevent insolvent banks from continuing in business. The Salmon Bank failed on June 20, 1905, after plaintiff had gone out of office in January, 1905, after a term of four years, and the petition charges that: "On June 28, 1905, in the edition of said newspaper bearing said date, in the editorial columns thereof, the defendant corporation (having reference to said Salmon Bank and plaintiff's connection therewith) did wrongfully, wickedly and with malice publish of and concerning plaintiff the following false, libelous and defamatory words and matter, to-wit: 'Is It a Political Junkshop? The special correspondent of the Post-Dispatch states upon authority of those having examined the Salmon Bank, that the bank has been insolvent since November, 1903. Why was not the bank closed at that time? Why was it permitted to keep its doors open and receive the deposits of a confiding public? Major Harvey Salmon [meaning one of the owners and proprietors of said Salmon Bank] was a member of the Democratic Central Committee, and the intimate political friend of the machine leaders of the Democratic party [meaning the political party with which plaintiff was allied and to which he owed his nomination and election to said office of Secretary of State]. The bank's books were examined just before Ex-Secretary of State Cook [meaning plaintiff] went out of office, but no action was taken and the bank was left open to take the money of unsuspecting depositors. Is the damaging derelict a part of the political junk of the old Democratice State Machine [insinuating and meaning thereby that the plaintiff herein while Secretary of State and while administering the duties of said office was guilty of wilful and malicious partiality, neglect and misconduct in his official capacity and of favori'ism and violation of official duty, and was actuated by personal, political and other improper motives in the matter of the examination and supervision of said Salmon Bank, whereby said bank was permitted to carry on its busi-

ness after it had become insolvent, and that in consequence
thereof its depositors were misled and deceived and suffered
financial loss and injury].' That defendant corporation in the
manner and by the means aforesaid did falsely, maliciously and
wickedly print, publish, circulate and give currency to the
charge that plaintiff while administering the office of Secretary
of State (said office being one of public trust as hereinbefore
stated) was guilty of partiality, favoritism, official miscon-
duct, violation of official duty, and was actuated by improper
motives in relation to the examination and supervision of said
Salmon Bank, as hereinbefore more fully stated." The stat-
ute provides that "every person exercising or holding any office
of public trust who shall be guilty of wilful and malicious
oppression, partiality, misconduct or abuse of authority in his
official capacity or under cover of his office, shall, on convic-
tion, be deemed guilty of a misdemeanor." *Held*, that the pub-
lication did not impute to plaintiff the commission of a crime,
and the case should not have been submitted to the jury upon
that hypothesis. The closing allegations of the petition, even
if regarded as matters of inducement, do not allege generally
that crime was imputed, nor that the partiality, favoritism or
official conduct, as set forth, was wilful or malicious, and in
the absence of such words of intent the misconduct alleged
cannot be construed as imputing crime within the meaning of
the law.

6. ————: ————: Sufficient, Nevertheless: Official Misconduct.
But while the said publication does not charge or impute crime
to plaintiff, nor that he was actuated by corrupt motives, it
does impute such official misconduct to him as brings it within
the statutory definition of libel, and if the facts were false a
good cause of action is stated in the petition.

7. ————: ————: Inducement: Place in Petition. Matter of
inducement should precede the libel and innuendo in the peti-
tion. The usual order of pleading is to set it out as prefatory
allegations.

8. ————: ————: Innuendo: Stating Defamatory Meaning In:
Inducement Necessary. Where the defamatory meaning does
not appear on the face of the article complained of, but depends
upon extrinsic facts, it is not sufficient that such defamatory
meaning be alleged in the innuendo only. The want of proper
inducement cannot be supplied by innuendo. Words not them
selves actionable, cannot be rendered so by innuendo, without
a prefatory averment of extrinsic facts, which makes them
libelous.

9. ————: Demurrer: Pleading Sufficient: Facts Insufficient:
Comment: Privilege. The publication in this case, charges

that plaintiff, as Secretary of State, having in charge the examination and supervision of banks, was neglectful of official duty and protected an insolvent bank out of political and personal friendship for one of its proprietors, and the petition sufficiently states a cause of action for libel as libel is defined in the statute; but the evidence is reviewed, and the facts stated in the publication being admitted to be true, the comment thereon was not libelous, and the demurrer to the evidence offered at the close of the case should have been sustained.

10. ——————: Comment: Political Junk. The facts stated in the publication being true it was the right of the newspaper, as of all others, to discuss the failure of the bank whose examination and supervision was imposed by law upon plaintiff as Secretary of State, and to discuss plaintiff as Secretary of State, and to discuss plaintiff's connection therewith; and the right of comment implied the right to discuss the facts and to place thereon the writer's own construction and to express his opinion of the motives which actuated plaintiff in his failure to examine and close the bank and protect the public, regardless of whether the opinion was right or wrong, provided it was based upon facts and was not malicious. And the facts stated, that plaintiff did not examine the bank, that it was insolvent and had been for a long time and that one of its proprietors was his political and personal friend, being established, it was not actionable comment to add, "Is the damaging derelict a part of the political junk of the old Democratic State Machine?" for this inquiry amounted only to: Was this insolvent bank allowed to remain open and take the money of the unsuspecting public because of the political friendship of the Secretary of State for its owners? and that natural inquiry or comment was suggested by the facts established.

11. ——————: ——————: Privilege: Justification: Question for Court. On rehearing it is *held* that the contention that if the publication is libelous on its face, the law presumes malice and falsity, and, the publication being admitted, the evidence could at most raise an issue of fact for the jury, and not a question of law for the court, is sound as to the defense of justification, but unsound as to the defense of privilege. Where the defense of privileged comment is interposed, plaintiff cannot rely on the presumption of malice, for the privilege is not removed except by proof that the facts were untrue or by proof of actual malice. Whereas, when justification is the defense, defendant must assume the burden of proving the truth of the facts stated in the publication.

12. ——————: Comment: Privilege: Overcome by Proof of Falsity or Malice. The burden is not on the plaintiff, in order to

make out a prima facie case of libel, to prove that the facts stated in the publication were false, or that defendant was actuated by express malice in the comments he made thereon. The true rule is that, when a defense of privileged comment on a matter of public interest is presented by the issues, the plaintiff may overcome the privilege pleaded, either by proof that the publisher was inspired by actual malice, or that the facts published and commented upon were false; if he fail to prove the one or the other, a prima facie case will not be made out, and the court should sustain a demurrer to the evidence.

Appeal from Boone Circuit Court.—*Hon. E. W. Hinton*, Special Judge.

REVERSED.

*Judson & Green* and *Edward C. Crow* for appellant.

(1) The article complained of does not impute to plaintiff a crime, and, therefore, it is not libelous *per se;* and, as the petition contains no allegation that any special damages were caused thereby, the article is not libelous in any sense. The petition, therefore, states no cause of action and the court should have taken the case from the jury. Heller v. Pub. Co., 153 Mo. 205; Ukman v. Record, 189 Mo. 378; Greenwood v. Colby, 26 Neb. 449; Herrington v. Ingberg, 97 N. W. 460; O'Neill v. Star Co., 106 N. Y. Supp. 973; Randall v. News Assn., 101 Mich. 561. (2) The article complained of contains only ordinary English words of well known and long established meaning, and it is clear that no words or clauses thereof are used in any ambiguous sense. Its meaning, therefore, could not be enlarged or extended by any innuendo. Salvateri v. Ghio, 9 Mo. App. 155; Ukman v. Record, 189 Mo. 378; Christal v. Craig, 80 Mo. 373; Dyer v. Morris, 4 Mo. 214; Callahan v. Ingram, 122 Mo. 366. (3) The article in question was a fair comment and criticism of the admitted public acts of a public officer, while in the discharge of the duties of his office, and, therefore, it

was not libelous.   Miner v. Post, 49 Mich. 358; Gott v.
Pulsifer, 122 Mass. 235; Jackson v. Times, 162 Pa. 406;
Townshend on Libel (4 Ed.), sec. 258; Newell on Libel,
sec. 5, p. 567; Odgers on Libel, 33; Duffy v. Post, 96
N. Y. Supp. 629; Callahan v. Ingram, 122 Mo. 365.
(4)   The right of comment and criticism includes the
right to draw reasonable and natural inferences and
conclusions from admitted facts or acts; and, the facts
which were the basis of this article being admitted, and
there being no evidence of malice or ill-will towards
plaintiff, the court should have instructed the jury to
find for the defendant, because any inferences the ar-
ticle contains are clearly natural and reasonable con-
clusions from the admitted facts.   Townshend on Libel
(4th Ed.), sec. 258; Newell on Libel (2nd Ed.), 568;
People v. Post, 54 Mich. 457; Jackson v. Times, 162
Pa. St. 406; Ingert v. Cycle Co., 73 L. J. (K. B. 1904)
754; Callahan v. Ingram, 122 Mo. 365.   (5)   The trial
court committed reversible error in permitting the
jury to determine whether the article charged plain-
tiff with the crime of wilful and malicious oppression
and partiality, or misconduct, in his official capacity,
or under color of his office, by plaintiff's instructions,
because the article in question contains no such charge
and no such meaning can be imputed to its language
without doing violence thereto.   State v. Pinger, 57
Mo. 243; State v. Grassie, 74 Mo. App. 313; Stone v.
Graves, 80 Mo. 148; State v. Hein, 50 Mo. 362; State
v. Mixan, 41 Mo. 210; United States v. Deaver, 14
Fed. 595; O'Neill v. Star, 106 N. Y. Supp. 973; Randall
v. News Assn., 101 Mich. 561; McManus v. Jackson,
28 Mo. 56.

*W. M. Williams, Silver & Dumm,* and *W. H. Roth-
well* for respondent.

(1) It is sufficient to make a written publication
libelous and actionable *per se* that it is false and tends

to expose one to public hatred, contempt and ridicule, or to blacken his reputation. Nelson v. Musgrave, 10 Mo. 648; Price v. Whitely, 50 Mo. 439; McGinnniss v. Knapp, 107 Mo. 131; Ukman v. Record, 189 Mo. 378; Manget v. O'Neill, 51 Mo. App. 26. And this is true even though the publication charges the person alleged to be defamed with no offense known to the law. Prewitt v. Wilson, 128 Iowa, 202; Haynes v. Press Co., 169 Mass. 512; White v. Nichols, 3 How. 266; R. S. 1899, sec. 2259. An article is presumed to be false and published without sufficient excuse until the contrary is shown. Russell v. Anthony, 41 Kan. 451; Holmes v. Clisberg, 121 Ga. 241; McIntyre v. Bransford, 17 S. W. 359. When the publication is libelous *per se* its falsity and defendant's malice are presumed. Brown v. Knapp, 213 Mo. 693; Thomas v. Bowen, 45 Pac. 768; Sander v. Jones, 13 N. D. 527; Morse v. Pub. Co., 124 Iowa, 707. (2) A defendant is liable for what is insinuated as well as for what is stated explicitly. Merrill v. Pub. Co., 197 Mass. 193; Brennan v. Tracy, 2 Mo. App. 540; State v. Norton, 89 Me. 294; Sturvelant v. Root, 27 N. H. 72; Drummond v. Leslie, 5 Blackf. (Ind.) 453; State v. Armstrong, 106 Mo. 395. (3) "A publication which falsely and maliciously charges a public officer with misconduct in office is a libel. It is libelous to impute to any one holding an office that he has been guilty of improper conduct in that office. 13 Am. & Eng. Ency. Law (1 Ed.), 309; Martin v. Paine, 69 Minn. 482. Words which impute a want of integrity to any one holding an office of confidence or trust are *per se* actionable. Pub. Co. v. Read, 13 Ky. L. Jour. 323; Scougale v. Sweet, 124 Mich. 323; Hiller v. Duff, 62 N. J. L. 101; Collins v. Pub. Co., 74 N. Y. Supp. 78; Tarraber v. Tribune, 36 Minn. 591; Wofford v. Meeks, 129 Ala. 349; Cramer v. Riggs, 17 Wend. 209; Russell v. Anthony, 21 Kan. 457. (4) The article sued on is not a fair comment and criticism of the public acts of plaintiff as Secretary of State, and is not non-libelous

for that reason. It assails his motives and his personal integrity in that it charges him with neglect of a public duty because of favoritism and partiality, that is, imputes to him flagrant malfeasance in office. 25 Cyc. 402; 24 Cyc. 401; Bearce v. Bass, 88 Me. 521; Negley v. Farrow, 60 Md. 177; Curtis v. Mussey, 6 Gray 273; Haynes v. Printing Co., 169 Mass. 515; Newell on S. & L., 69; Russell v. Anthony, 21 Kan. 417; Shepherd's Case, 177 Mo. 244. The intentions and motives of a person are questions of fact to be submitted to the jurors. This is true, both in civil and criminal causes. Vansicle v. Brown, 68 Mo. 634; State v. Williams, 95 Mo. 247. The question of intent may never be ruled as one of law, but should always be submitted to the jury. People v. Flack, 125 N. Y. 324. Whether the publication complained of was a fair comment on and criticism of the public acts of plaintiff as a public officer, was, on the most favorable view of the matter, a question for the jury, as the trier of the facts. "A better view therefore, seems to be that it is only when the publisher goes beyond the limits of fair criticism that his language passes into the region of libel, and the question whether those limits have been transcended, is one for the jury." 18 Am. & Eng. Ency. Law (2d Ed.), 1021-2; Trigg v. Printing Co., 179 N. Y. 154; Fay v. Harrington, 176 Mass. 270. (5) Defendant's demurrer to the evidence interposed at the close of plaintiff's case in chief, was rightly overruled; besides, the defendant having proceeded with its case, the case now stands for testing its sufficiency on all the evidence in the case. Klockenbrink v. Railroad, 172 Mo. 683; McGinnis v. Knapp, 109 Mo. 131; 18 Am. & Eng. Ency. Law (2 Ed.), p. 994; Sanderson v. Caldwell, 45 N. Y. 401; Warner v. Southall, 4 Ex. L. R. 284. (6) "The rule has, however, been for more than a century, that innuendoes and colloquia are sufficient if the inference they seek to raise is at all admissible, and that the question whether the expressions used were designed

by the defendant to apply to the person to whom it
is charged they were intended to apply, is a question
of fact for the jury.'' State v. Powell, 66 Mo. App.
614; Scofield v. Press Co., 126 Wis. 81; McGinniss v.
Knapp, 109 Mo. 139; 13 Pl. & Pr. 55; Gaither v. Adv.
Co., 102 Ala. 462; Blagg v. Sturt, 59 Eng. Com. L. 899;
Peterson v. Sentman, 37 Md. 140; Argabright v. James,
46 W. Va. 144; Pollard v. Lyon, 91 U. S. 233; Ukman
v. Record, 189 Mo. 393. The amended petition in this
case sets forth, as was necessary for the pleader to
do, the prefatory statements that the plaintiff was
Secretary of State, an office of public trust, from the
first Monday in January, 1901, to January 9, 1905; that
as such officer it was his duty to examine the banking in-
stitutions of the State, their financial conditions and
methods, and to require them to observe the law relat-
ing to and governing said banking institutions; that the
Salmon Bank was one of said banking institutions do-
ing business at Clinton in Henry county, Missouri, dur-
ing plaintiff's term of office; that on June 28, 1905, the
defendant, having reference to said Salmon Bank, and
plaintiff's connection therewith, published of and con-
cerning plaintiff the article complained of. Without
these prefatory statements the article would have
been obscure and the references and allusions therein
would not have been plain or certain, hence the neces-
sity of the prefatory averments, the inducement in the
petition. With these prefatory averments giving ap-
plication and explanation to the matter of the article
complained of, the explanatory meaning given by the
innuendo was warranted. Peterson v. Sentman, 37
Md. 140; Argabright v. James, 46 W. Va. 444; Pollard
v. Lyon, 91 U. S. 233; Ukman v. Record, 189 Mo. 378.

KENNISH, P. J.—This is an appeal from a judg-
ment in an action for libel. The suit was brought in
the circuit court of Cole county. On the application
of the defendant a change of venue was awarded to

the circuit court of Boone county, where, upon a trial, at the January term, 1906, a verdict was returned in favor of plaintiff for fifty thousand dollars, twenty-five thousand as compensatory damages and a like sum as punitive damages. Judgment was rendered accordingly and defendant appealed to this court.

By way of inducement and colloquium it is alleged in the petition substantially that plaintiff held the office of Secretary of State in this State from the second Monday in January, 1901, until January 9, 1905, and that as such officer it was his duty under the law, either in person or by bank examiners appointed by him, to examine into the financial condition of all State banks of this State and to require the said banks to comply with the laws relating to them. That during plaintiff's term of office Harvey W. Salmon and G. Y. Salmon were the owners of a private bank and were engaged in the banking business at the city of Clinton in this State, under the name of "Salmon Bank." That the said bank continued in business throughout plaintiff's term of office and until about the 20th day of June, 1905, at which time its business as a private bank was discontinued. That the defendant is a domestic corporation with a paid-up capital stock of one million dollars, and is the owner and publisher of a daily newspaper known as the St. Louis Post-Dispatch. That the said newspaper is printed and published in the city of St. Louis where the defendant has its principal office and is sold and circulated, not only in the city of St. Louis, but in the counties of this State, including Cole county, and also in several other States of the Union.

The petition then alleges the publication of the article complained of as follows:

"That on June 28, 1905, in the edition of said newspaper bearing said date, in the editorial columns thereof, the defendant corporation (having reference to said Salmon Bank and plaintiff's official connec-

tion therewith) did wrongfully, wickedly and with malice publish of and concerning plaintiff the following false, libelous and defamatory words and matter, to-wit:

## "IS IT A POLITICAL JUNKSHOP?

"The special correspondent of the Post-Dispatch states upon authority of those having examined the Salmon Bank at Clinton, that the bank has been insolvent since November, 1903, when George M. Casey failed. Why was not the bank closed at that time? Why was it permitted to keep its doors open and receive the deposits of a confiding public? Major Harvey Salmon (meaning one of the owners and proprietors of said Salmon bank) was a member of the Democratic State Central Committee, and the intimate, political friend of the machine leaders of the Democratic party (meaning the political party with which plaintiff was allied and to which he owed his nomination for and election to said office of Secretary of State). The bank's books were examined just before Ex-Secretary of State Cook (meaning plaintiff herein) went out of office, but no action was taken and the bank was left open to take the money of unsuspecting depositors. Is the damaging derelict a part of the political junk of the old "Democratic State Machine" (insinuating and meaning thereby that the plaintiff herein while Secretary of State of this State as aforesaid and while administering the duties of said office was guilty of wilful and malicious partiality, neglect and misconduct in his official capacity and of favoritism and violation of official duty, and was actuated by personal, political and other improper motives in the matter of the examination and supervision of the said Salmon Bank at Clinton, Missouri, whereby said bank was permitted to carry on its business after it had become insolvent and that in consequence thereof its depositors were

misled and deceived and suffered financial loss and injury).''

The petition then alleges the number of copies placed in circulation of the edition of the paper containing the publication complained of and that copies thereof were sold and published in said Cole county.

It is thereafter alleged: ''That ·defendant corporation in the manner and by the means aforesaid did falsely, maliciously and wickedly print, publish, circulate and give currency to the charge· that plaintiff, while administering the office of Secretary of State of this State (said office being one of public trust as hereinbefore stated), was guilty of partiality, favoritism, official misconduct, violation of official duty and was actuated by improper motives in relation to the examination and supervision of said Salmon Bank, as hereinbefore more fully stated and set out.''

Judgment is prayed for actual damages in the sum of fifty thousand dollars and for the same amount as punitive damages.

A demurrer to the petition was overruled and defendant filed an answer· consisting of three separate defenses: First, a plea to the jurisdiction of the court; Second, an admission of the publication of the article set out in the petition, also of the formal allegations of the petition as to matter of inducement, but denies that the alleged cause of action accrued in Cole county, denies the *innuendo* set forth in the petition, denies that the said publication was false, malicious or defamatory and denies generally the other allegations of the petition; Third, a defense setting forth at length facts covering the history of the Salmon Bank, its bad investments and unsafe condition as disclosed by examinations both before and during plaintiff's term of office, and plaintiff's failure to examine the bank as required by law, also the friendly political relations existing between plaintiff and the owners of the bank;

241 Sup.—22

that when the bank was closed defendant sent correspondents to Clinton to investigate the facts and faithfully published such facts in its columns; that the facts stated in the article complained of were true and the comments thereon were lawful, fair and honest.

The reply contained a plea alleging a waiver of jurisdiction and that the alleged want of jurisdiction had been been submitted to and decided by the court in Cole county and was therefore adjudicated. Also a denial of the allegations of paragraph three of the answer.

On the trial, after introducing testimony in support of the matters of inducement alleged in the petition, plaintiff read in evidence the article in suit, also an article relating to the same subject which appeared in an issue of the same paper on July 2, 1905, and rested.

A peremptory instruction in the nature of a demurrer to the evidence was asked by defendant and refused.

The defendant then introduced evidence in support of its answer which covers over four hundred pages of the printed record. This testimony was largely as to the history of the Salmon Bank from its establishment in the year 1868, and particularly as to its financial condition and the reports of bank examiners concerning it during the period of about six or seven years before it was closed. The facts thus developed tended to prove that the owners of the bank had invested largely in cattle ranches in Texas and elsewhere and that the capital therefor had been borrowed from this bank. These ventures were unsuccessful and so involved the affairs of the bank that during the administration of plaintiffs' predecessor in the early part of the year 1900, Bank Examiner Oldham, who had recently examined the bank, wrote to plaintiff's predecessor concerning the necessity of keeping a close watch on this bank, concluding his letter with the statement,

"I am thoroughly of the opinion that they cannot hold out much longer and that a collapse is inevitable." In his written report, made in March, 1900, among other statements showing his opinion as to the dangerous condition of the bank, he said: "I regard the condition of this bank as extremely critical—such as to cause the gravest apprehension." Much correspondence as to the unsafe condition of the bank followed its said examination, all of which was indexed and placed on file in the office of the Secretary of State and remained there during plaintiff's entire term of office. The condition of the bank, as disclosed by Examiner Oldham's report in March, 1900, resulted in a conference between the officers of the bank and the Secretary of State and two bank examiners, in June of that year. At this conference promises were made by the officers of the bank that they would correct the irregularities pointed out, and the Secretary of State then required that the bank make monthly reports to him as to its condition and progress. The bank was again examined December 5, 1900, which disclosed that it had not complied with the requirements and that its condition was unsatisfactory to the department. A letter was then written to the bank by plaintiff's predecessor, calling attention to their failure to correct the irregularities as promised.

Under plaintiff's administration of four years this bank was examined but three times, the last being only a few days before the expiration of plaintiff's term of office. For a period of more than two years while plaintiff was in office, including the year of the Casey failure, it had not been examined at all, although every other bank in the district had been examined at least once during that time, many of them twice and some of them three times. The bank was closed June 20, 1905. Its liabilities were about eight hundred thousand dollars and its assets about ninety-five thousand dollars. When the last examination was made

before the failure, being shortly before the expiration of plaintiff's official term, the bank had on hand, as a part of its assets, forged notes amounting to about two hundred thousand dollars, which plaintiff's examination had failed to discover, besides much of the paper which plaintiff's predecessor had objected to more than four years before. These forged notes and worthless paper were still in the bank at the time of its failure. There was money of about fourteen hundred depositors, including sixty-five thousand dollars of county and school money on deposit when the bank was closed. The names of many prominent citizens had been forged to notes found among the bank's assets. There was much excitement in the county and public meetings were called to discuss the failure, which was also widely discussed by the press of the State.

In rebuttal plaintiff testified in his own behalf that when he was elected to the office of Secretary of State he was not an experienced banker and tried to have as competent men under him as he could secure and so retained all of his predecessor's bank examiners, and that they were all competent men. That he knew Major Salmon well and had been associated with him politically and that they were close friends. That he had entire confidence in Major Salmon's integrity and regarded both owners of the bank as being solvent and wealthy men. That he had no reason to believe that they were in an embarrassed financial condition. That he had never received any political favors from Major Salmon and that he had not neglected his official duty nor favored Major Salmon in discharging the duties of his office.

Mr. Bunce and Mr. Carstarphen, bank examiners under plaintiff, testified as to the examination of the bank during plaintiff's administration.

Defendant offered testimony in rebuttal and at the close of all the evidence renewed its instruction in the nature of a demurrer, which was again refused.

I. Appellant first assigns as error the action of the court in overruling defendant's plea to the jurisdiction of the court over the person of the defendant. Respondent answers that the record fails to show an exception to the ruling thus complained of and that therefore that question is not now open to review. In view of the fact that appellant in its printed argument concedes that this court has recently decided against its contention on the merits of its plea to the jurisdiction and further states that the point is saved only for review in the Supreme Court of the United States, we disallow this assignment without further consideration. [Julian v. Kansas City Star, 209 Mo. 35; Cook v. Globe Pub. Co., 227 Mo. 471.]

II. Complaint is made that the court erred in refusing defendant's instruction in the nature of a demurrer, asked at the close of plaintiff's evidence in chief and renewed at the close of all the evidence. The ruling of the court in refusing such instruction when first asked, need not be considered, for, by offering evidence in support of its answer and renewing its demurrer at the close of all the evidence, the defendant waived its rights under the first demurrer, and must now stand upon the action of the court when the instruction was refused a second time and as viewed under all of the evidence in the case. [Weber v. Strobel, 236 Mo. 649; Klockenbrink v. Railroad, 172 Mo. 678; Eswin v. Railroad, 96 Mo. 290.]

In libel and slander cases the practice is recognized and commended of challenging the sufficiency of plaintiff's case, both as to the law and the evidence, by an instruction in the nature of a demurrer, as was done by the defendant in this case. [Diener v. Chronicle Pub. Co., 230 Mo. 613; Ukman v. Daily Record Co., 189 Mo. 378; Heller v. Pulitzer Pub. Co., 153 Mo. 205.]

In support of the assignment of error under review it is contended by appellant that: "The article

complained of does not impute to plaintiff a crime, and, therefore, it is not libelous *per se;* and, as the petition contains no allegation that any special damages were caused thereby, the article is not libelous in any sense. The petition, therefore, states no cause of action and the court should have taken the case from the jury.''

While the absence of an imputation of crime does not necessarily render a publication non-libelous *per se,* yet the question whether crime is so imputed by the publication, is properly presented for decision in this case; for, if it does impute crime, the authorities are agreed that it is libelous *per se* and it would follow that the instruction in the nature of a demurrer, so far as it challenged the sufficiency of the petition, was correctly refused. That part of the article, together with the innuendo explanatory thereof, counted upon by the plaintiff in connection with the context, as imputing the commission of a crime, is as follows: ''Is the damaging derelict a part of the political junk of the old 'Democratic State Machine' (insinuating and meaning thereby that the plaintiff herein while Secretary of State of this State as aforesaid and while administering the duties of said office was guilty of wilful and malicious partiality, neglect and misconduct in his official capacity and of favoritism and violation of official duty and was actuated by personal, political and other improper motives in the matter of the examination and supervision of said Salmon Bank at Clinton, Missouri, whereby said bank was permitted to carry on its business after it had become insolvent and that in consequence thereof its depositors were misled and deceived and suffered financial loss and injury).'' The crime which respondent maintains was thus charged against plaintiff is defined by section 4411, Revised Statutes 1909, as follows: ''Every person exercising or holding any office of public trust who shall be guilty of wilful and malicious oppression, partiality, misconduct or abuse of authority in his official capacity

or under color of his office, shall, on conviction, be deemed guilty of a misdemeanor.''

Two questions are thus presented: Does the petition state a cause of action against the defendant, upon the ground that the publication complained of imputed to plaintiff the crime denounced by said section 4411, or do the alleged defamatory words, when construed according to their plain and ordinary meaning, impute to plaintiff such crime? If not, then unless the words are libelous *per se* upon another ground to be referred to presently, the court should have given the instruction as requested, for whether the petition was sufficient in law or whether the words were capable of the defamatory meaning ascribed to them, were questions of law for the court. After a consideration of these questions, both from the stand-point of the cause of action pleaded and the meaning of the words complained of, we have concluded that the court should not have submitted the case to the jury on the hypothesis that the publication imputed to plaintiff the commission of a crime.

If a publication directly imputes crime it is libelous *per se* and in such case it is not necessary in the statement of a cause of action thereon to plead any extrinsic facts as inducement or to add an innuendo as to the defamatory meaning. On the other hand, if the publication is libelous *per se* as imputing crime, but extrinsic facts are necessary to bring out the defamatory meaning, then the law requires the allegation of such facts as inducement, in order that the actionable character of the words may appear. The publication complained of in this case belongs to the latter class, because it does not impute crime on its face. It was therefore necessary that the petition should state the facts showing the defamatory meaning and the crime imputed.

The only averment in the petition as to the libelous character of the words, aside from the innuendo, is the

following: "That defendant corporation in the manner and by the means aforesaid did falsely, maliciously and wickedly print, publish, circulate and give currency to the charge that plaintiff while administering the office of Secretary of State of this State (said office being one of public trust as hereinbefore stated) was guilty of partiality, favoritism, official misconduct, violation of official duty and was actuated by improper motives in relation to the examination and supervision of said Salmon Bank, as hereinbefore more fully stated and set out." This averment, which is not set out in the petition with the prefatory allegations of inducement, may be considered as matter of inducement, although out of the usual order of pleading, in following instead of preceding the alleged libel and innuendo. [Townshend on Slander and Libel (4 Ed.), 451; Beswick v. Chappell, 47 Ky. 486.] Regarding the said allegation as inducement, it is clear that it does not allege an imputation of crime to the plaintiff in the publication complained of. It does not allege generally that crime was imputed, nor that the partiality, favoritism, or official misconduct, as set forth, was either wilful or malicious, and in the absence of such words of intent the misconduct alleged cannot be construed as imputing crime within the meaning of the law. [State v. Boyd, 196 Mo. 52; State v. Hein, 59 Mo. 362.] On the other hand, this allegation does charge the imputation of official misconduct in the publication, a material allegation on the subject hereinafter discussed as to whether the petition states a cause of action upon another and different ground.

Where the defamatory meaning does not appear on the face of the article complained of, but depends upon extrinsic facts, it is not sufficient that such defamatory meaning be alleged in the innuendo only. The law upon this subject is stated in Townshend on Slander and Libel (4 Ed.), 566, 567, as follows: "An innuendo can not perform the office of an inducement;

in other words, the want of proper inducement cannot be supplied by an innuendo. The absence of *inducement,* showing by extrinsic matter that the words charged are actionable, is not supplied by an innuendo attributing to those words a meaning which renders them actionable. Words not in themselves actionable, cannot be rendered so by an innuendo, without a prefatory averment of extrinsic facts, which makes them slanderous." In the early case of Church v. Bridgman, 6 Mo. 190, plaintiff sued to recover damages for slander. The alleged slanderous words were that Church was in the habit of passing counterfeit money and had passed a ten-dollar counterfeit note on one Simms and had taken counterfeit money back in the county and purchased horses. The petition failed to allege by way of inducement the defamatory meaning of the words complained of, but, as in the case at bar, sought to impute the defamatory meaning of the alleged slander by an innuendo stating, "meaning that he, the said Church, knew the same to be counterfeit." Discussing the question of pleading, as to the sufficiency of the plaintiff's statement of his cause of action, this court, through NAPTON, J., said: "But the declaration in this case is fatally defective. The slander imputed was in relation to passing counterfeit money, which is no offense under our law, unless it is done knowing the same to be counterfeit. There is no colloquium in the declaration averring that the defendant spoke the words of and concerning the plaintiff, and of and concerning his commission of the offense of passing counterfeit money, knowing the same to be counterfeit. The want of this averment in the colloquium is not helped by the innuendo." In the case of McManus v. Jackson, 28 Mo. 1. c. 58, this court said: "It is well settled that it is not actionable to charge a person with swearing a lie, unless the petition shows that the speaking of the offensive words had reference to a judicial proceeding. [Harris v. Woody, 9 Mo.

112.] The reason is that the words standing alone do not impute a crime, for a man may swear falsely without even having taken an oath in any court or before any officer authorized to administer one.. Such words, however, may be rendered actionable, if by way of *inducement* it is set out that there had been a trial or other proceeding in which the plaintiff was sworn as a witness, and that the defendant in using the offensive words referred to such matter and intended to charge the plaintiff with the crime of perjury. . . . That section [now sec. 1837, R. S. 1909] has, however, a limited operation, for though it dispenses with the necessity of showing by extrinsic facts the application of the words to the plaintiff, it is still necessary when the words are not actionable to show their meaning by proper averments in the inducement." And in the case of Powell v. Crawford, 107 Mo. l. c. 601, this court said: "We think the court committed no error in holding that the petition in this case failed to state a cause of action. The words charged to have been spoken of the plaintiff are not slanderous *per se,* and, to make them actionable, the colloquium must show that they were used in· a connection and sense to make them slanderous. Nor can this be shown by the innuendo. It is not the office of the innuendo to make averments. [Bundy v. Hart, 46 Mo. 464; Christal v. Craig, 80 Mo. 367.] Viewing the *colloquium* alone, therefore, we fail to discover that the plaintiff was charged with a crime or even a fraud." [See also Boyce v. Aubuchon, 34 Mo. App. l. c. 323; Krup v. Corley, 95 Mo. App. 640.]

For the foregoing reasons we think the petition failed to state a cause of action upon the ground that the alleged libel imputed crime to the plaintiff. We also hold that the words of the publication are not susceptible of the meaning that crime is imputed thereby to the plaintiff, as will appear from a discussion thereof further on in this opinion.

Cook v. Publishing Co.

Because of its failure to state a cause of action on the ground that the words complained of imputed crime, it does not follow that the petition was fatally defective.

As defined by statute, a libel is "the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, or any malicious publication made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends." [Sec. 4818, R. S. 1909.]

It is contended by respondent that the publication is libelous *per se* within the meaning of the statute and without the aid of extrinsic facts to show its defamatory meaning. It is stated in the article that plaintiff held the office of Secretary of State and that for more than a year before the expiration of his term of office the Salmon Bank at Clinton was insolvent, and it asks why the bank was permitted to keep its doors open and receive the deposits of a confiding public. It also appears that Major Salmon, one of the owners of the bank, was the political friend of the plaintiff. That the bank's books were examined just before plaintiff went out of office, but that no action was taken, and the bank was left open to take the money of unsuspecting depositors. The article concludes with the question, "Is the damaging derelict a part of the political junk of the old Democratic State Machine?" These words, when considered with their context and given their ordinary and natural meaning and understood as the reader would understand them, do not stop with the imputation of mere official neglect in failing to examine the bank. The statement of the friendly political relationship existing between plaintiff and one of the owners of the bank gives a sting and edge

to the language by leaving the inference that it was because of such relationship the bank was permitted by plaintiff to remain open and the public sustained the loss of the funds deposited in the insolvent bank. While the publication does not charge or impute crime to plaintiff, nor that he was actuated by corrupt motives, it is, in our opinion, open to the construction of imputing such official misconduct as would bring it within the statutory definition of libel, and if the facts stated were false, then, under the allegations of the petition, a good cause of action was stated. "Written words which impute that one who holds an office has been guilty of improper conduct in that office, or has been actuated by wicked, corrupt or selfish motives, or is incompetent for the position, are actionable." [18 Am. & Eng. Ency. Law (2 Ed.), 949; 25 Cyc. 402, and cases cited; Townshend on Slander and Libel (4 Ed.), sec. 196; Odgers on Libel and Slander (4 Ed.), p. 24; Tawney v. Simonson, 109 Minn. l. c. 348.]

The petition being sufficient, as we have held, the correctness of the court's action in refusing the defendant's instruction in the nature of a demurrer, depends upon whether, under all the evidence, plaintiff was entitled to have his case submitted to the jury. The substance of the evidence has been given in the statement of facts. Appellant maintains that the truth of every fact stated in the article was not only proved by the evidence, but that there was no evidence to the contrary. And, excepting the headline and concluding sentence, we think the truth of the article was fully established by the proof. It was shown by documentary evidence, on file in the plaintiff's office during his entire term, that the Salmon Bank was in a most unsafe condition for about a year before plaintiff's term of office began. Bank Examiner Oldham, who examined the bank in March of that year, said in his report: "I regard the condition of this bank as extremely critical—such as to cause the gravest appre-

hension." And: "I therefore recommend that a firm stand be taken and energetic measures be employed in order to put the affairs of this institution in a safe condition and to avert a disastrous collapse." This examiner then also wrote to the department, saying: "I examined Salmon & Salmon Friday and Saturday and regard their condition as extremely critical. Unless they can unload something soon and realize cash I don't see how they can pull through." And again: "It will take energetic and heroic measures to keep that bank open. I note the excuse they make for including the State Bank (85,000 or 90,000) in due from banks good on sight draft. It seems to me that it required a great stretch of the conscience to make oath that the amount due from the defunct State Bank was good on sight draft. Neighboring bankers thought it was the best statement S. & S. ever published while really the poorest. It was a fraud on the public and ought not to be tolerated. They will lose 40,000 to 50.000 on that deal anyway. Casey is not cut out for a banker and such management as his will wreck any bank. The d—l will be to pay when they do bust, an event that I regard as inevitable."

After the report of Oldham's examination in March, 1900, the Secretary of State, plaintiff's predecessor, wrote a long letter to the bank, calling attention to the many irregularities disclosed by the examination. This letter sets forth twenty-nine large loans due the bank, of which it is said. "Some of this paper, I am informed, is absolutely worthless, while the balance of it, where secured at all, is backed by securities that are very slow and inactive, and if they can ever be realized on it will require a long time to do it. . . . Some decided action must be taken concerning it, as further delay will eventually result in wrecking this bank."

In June of that year a conference was held in Kansas City between the officers of the bank, the Secretary

of State and two of his examiners. An arrangement was made by which the bank was to report to the department each month, showing progress in correcting the irregularities to which attention had been called by the examiner and the Secretary of State. These reports were made each month until plaintiff's term of office began, after which they were discontinued.

The bank was again examined on December 5th-7th, 1900. In a letter of the Secretary of State to the bank, commenting on its condition, it is said: "I am pleased to say that it shows that you have made some headway in cleaning up the matters complained of at the last examination, but out of the twenty-nine loans that were specially pointed out as needing immediate attention, you still have on hand twenty, and six of the twenty remain unchanged. . . . You publish to the world that you have $416,517 loans and discounts, undoubtedly good and clear of incumbrances, as one of the guarantees for the safety of the deposits that you are daily receiving. That is not a correct statement, nor is it a fair statement to the public nor the other bankers in your section of the State."

The first examination after plaintiff's term began was in December, 1901, in the report of which it was stated that: "Personal loans aggregate $492,004.66; $100,000 of this paper *is not desirable* or bankable paper." And further: "In regard to the loans about which requirements were made, there is very little change."

The next examination was made in December, 1902, and in the report of this examination attention was called, by red pencil marks, to the notes "long past due," and further to the fact that $79,000 of the bank's reserve consisted of the assets of the defunct State Bank of Clinton, which were considered of little value. A number of other irregularities in this report were also underscored in red pencil. It was shown that these marks were made to indicate to plaintiff that the

items thus designated needed attention. Following this examination, the plaintiff personally wrote a letter to the bank, in which it was said: "The bank is found in its usual solvent condition and doing a large business." The only criticism made in that letter was that the bank had failed to place to the surplus fund an amount equal to ten per cent of the dividends paid. The bank was not examined at all in the year 1903, although the other bank in Clinton was examined in that year. Casey, a heavy borrower of the bank, failed in 1903, and his failure caused a run on the bank. Plaintiff heard of the Casey failure and its effect on the bank, and telephoned concerning it to McDonald, of St. Louis, who had formerly been connected with the Salmon Bank and was supposed to be informed as to its condition. McDonald told plaintiff that the bank was secured on the Casey paper by life insurance policies which made it safe. No examination was made in the year 1904. No other bank in the district had remained unexamined for the years 1903 and 1904. A few days before plaintiff went out of office the bank was examined by one of the plaintiff's examiners and was reported in good condition, although over two hundred thousand dollars of forged notes were then among the assets of the bank and were treated as genuine in the report. The bank examiner who made that examination stated that he made it for his own protection. His explanation of this statement was that he made the examination "to keep down any criticism." When the bank failed it still had among its assets much of the paper which plaintiff's predecessor in 1900 had demanded should be taken up.

The evidence showed that plaintiff and Major Salmon, one of the owners of the bank, were close personal and political friends.

Assuming the truth of the facts stated in the article, it is contended by appellant that the concluding sentence, "Is the damaging derelict a part of the po-

litical junk of the old Democratic State Machine?'' is not a statement of fact, but a fair and honest comment upon and inference drawn from the preceding facts of the article, concerning a matter of public interest, the official acts of a public officer, and therefore privileged and non-libelous under the law.

The legal propositions invoked by appellant that a newspaper has the right fairly and honestly to comment upon a matter of public interest, and that the official conduct of a public officer is a matter of public interest, are well settled. [Branch v. Knapp & Co., 222 Mo. 580; 25 Cyc. 402; 18 Am. & Eng. Ency. Law (2 Ed.), 1041; Odgers on Libel and Slander (4 Ed.), 184.]

This brings us to a consideration of the question as to the actionable character of the last sentence of the article, namely: ''Is the damaging derelict a part of the political junk of the old Democratic State Machine?'' Is this language to be regarded as the statement of a fact and therefore libelous, if false, or as a comment and opinion based upon the facts previously stated and therefore non-libelous, upon the ground of the qualified privilege of all persons to criticize and comment upon matters of public interest? These questions must be considered in the light of the context and the facts and circumstances as disclosed by the evidence. While the language of this interrogatory is unusual, because of the figurative expressions employed, the meaning is neither obscure nor double. We attach little importance to the words ''old Democratic State Machine.'' So far as they lend support to plaintiff's cause of action and have reference to the subject of the article, the failure of the bank, they mean nothing more and serve no other purpose than to give point to the fact of the friendly political relations existing between plaintiff and the owners of the bank, a fact not only proved by the testimony, but admitted by the plaintiff on the witness stand. The words ''dam-

aging derelict" contain no hidden meaning and are intended merely as a striking phrase, descriptive of the insolvent defunct bank. The words "political junk," in the connection used, mean the result or effect of politics as influencing the plaintiff's official conduct in dealing with the Salmon Bank. In plain, ordinary words the meaning and import of the full sentence is this: Was this insolvent bank allowed to remain open and take the money of the unsuspecting public because of the political friendship of the Secretary of State for the owners of the bank. Looking at the entire sentence in the light of the context and the evidence, what new or additional facts do we find stated? Clearly none except the suggestion of political friendship for Major Salmon as a motive for plaintiff's official dereliction with reference to the Salmon Bank.

Under the facts in evidence it was the undoubted right of the defendant, and of all others, to discuss the failure of the bank and the official conduct of plaintiff in connection therewith. Was this right of comment restricted to a restatement of the naked facts, without drawing inferences or expressing opinions thereon, or did the right of comment mean the right to discuss the facts and place thereon the writer's own construction, and to express his opinion of the motives which actuated the officer in his failure to examine and close the bank and protect the public, regardless of whether the opinion was right or wrong, provided it was based upon facts and was not malicious? The two facts that plaintiff and one of the owners of the bank were close political friends, and that this insolvent bank had not been examined for two years, during which time no other bank in the district had escaped examination, fully warranted the inference of that relationship as the cause of the plaintiff's omission to examine this bank. Indeed, the comment suggesting the motive follows as the shadow of the imputation already cast by the facts pre-

viously stated. Plaintiff's failure to protect the public by closing the bank may have been due to neglect or inadvertence, or to his lax enforcement of the law as to that bank because of his political friendship for the owners. It will not do to say that the right of comment would permit the defendant to suggest the first and most favorable explanation, but deny to it the right, in good faith, to suggest the second, which was fully warranted under the conceded facts. The right to comment on matters of public interest means the right to express opinions as to the acts of a public officer and to draw inferences as to his motives, whether such opinions or inferences are right or wrong, reasonable or unreasonable, provided they are made in good faith and based upon the truth. [Branch v. Knapp & Co., 222 Mo. 580; United States v. Smith, 173 Fed. 227; Howarth v. Barlow, 113 App. Div. (N. Y.) 510; Townshend on Libel and Slander (4 Ed.), 258.]

Discussing the question of the right to comment upon the official acts of a public officer, this court, in the case of Branch v. Knapp & Co., supra, l. c. 603, said: "The plaintiff was a public officer. The article related to his action as such, to-wit, his vote for United States Senator, and as such was subject to a fair criticism by the newspaper press. It is not libelous merely to point out a seeming inconsistency in a public officer, and while our laws rigidly protect the private character of the citizen, the acts of a public officer are fairly open to criticism and comment."

The subject has been recently considered in the case of Howarth v. Barlow, supra, and because of its applicability, both in law and fact, to the case in hand, we feel justified in quoting therefrom at some length. It appeared that the plaintiff, a clerk of a board of village trustees, presented bills for audit, among which was a bill for material furnished by the claimant to the plaintiff personally. The matter being taken up by

the village taxpayers' association, the defendant, a member of that association, laid the bill before the village president, saying that it had been "held up" by the committee, and "you see what the intent was. . . . You should call for his resignation," etc. The plaintiff sued for slander and testified that his personal bill had been submitted for audit and payment by the city innocently and through mistake. The defendant had expressed the opinion that it was intentionally done to defraud the city, and the question was presented as to the liability of the defendant for imputing a wrong motive to the conduct of the plaintiff. On these facts GAYNOR, J., speaking for the court, said:

"It is enough to say that the plaintiff was in the wrong, either by design or official negligence, in presenting the claim to the trustees, and that it was the right of the defendant to show the matter to the president of the village, or to any citizen, and discuss it fully, and call in question whether the plaintiff had an honest intent in including a false item in the claim. And he was by no means obliged to take the plaintiff's word for it, or that of the claimant.

"The plaintiff's whole official conduct in the matter was open to the fullest criticism, and the defendant and all other persons had the right to draw from it and express any opinions or inferences that could be drawn from it, although contrary, and it may be, more reasonable ones could be drawn from it. That such opinions or inferences are far-fetched, high strung or severely moral, or contrary to other opinions or inferences that seem more reasonable, does not matter so long as there be a basis for them in the acts or words of the person who is the subject of such criticism. The majority or prevailing opinion is not the test of whether such opinion or inference be permissible. The prevailing or majority opinion is often the wrong one, and for that reason the law gives full latitude to the expression of any and all opinions on things of general

concern. It does not matter that the opinions or inferences expressed are not the most charitable or reasonable ones, or that they are the wrong ones, provided they be based on the facts, and the facts are capable of them. This is the rule of latitude of discussion and criticism of the conduct of every one who holds a public office, or writes a book, or does any act by which he invites public attention and criticism. [McDonald v. Sun Printing and Pub. Assn., 45 Misc. Rep. 441.]

"The people are not obliged to speak of the conduct of their officials in whispers or with bated breath in a free government, but only in a despotism. On the contrary, they have a right to speak out in open discussion and criticism thereof, the only test being that they make no false statement. And this is the great safeguard of free government and of pure government. This is fundamental among us. The defendant made no false statement, and had the right to question the intent of the plaintiff from his concededly unlawful act, and the ease with which it could be made the means of spoliating the public funds. The plaintiff's act was susceptible of an inference of wrong intent."

In the case of the United States v. Smith, 173 Fed. 240, a case in which the defendants were sued for an alleged libel in charging fraud in the purchase by certain parties representing the United States Government, of the rights of a French company in the Panama Canal property, the court, in the course of the opinion, said: "It is the duty of a public newspaper, such as is owned and conducted by these defendants, to tell the people, its subscribers, its readers, the facts that it may find out about public questions, or matters of public interest and it is its duty and its right to draw inferences from the facts known—draw them for the people."

In the exercise of the right of criticism in matters of public interest it necessarily results that public officers will not always be placed before the people in

their true character but that their official acts will be misconstrued and wrong motives will be imputed even when they are entirely free from blame and no valid basis for unfavorable comment exists. That is the common experience of all who have held public office. This incident of official position was aptly expressed by the noted English jurist, COCKBURN, C. J., as follows: "Those who fill 'a public position must not be too thin-skinned in reference to comments made upon them. It would often happen that observations would be made upon public men which they knew from the bottom of their hearts were undeserved and unjust; yet they must bear with them, and submit to be misunderstood for a time, because all knew that the criticism of the press was the best security for the proper discharge of public duties.' " [Newell on Slander and Libel (2 Ed.), p. 577.]

Whether the plaintiff in failing to enforce the law against the Salmon Bank, was or was not actuated by the motives imputed in the article complained of, we are satisfied that such an inference and comment was fully warranted by the facts and circumstances in evidence, and as the facts upon which the comment was made were true, the publication was not defamatory under the law of libel but was priviliged as a criticism and comment upon a matter of public interest.

In the conlusion arrived at we have not overlooked the principle of law that comment and criticism, to be privileged, must be fair and honest and not malicious, and that whether it is fair and honest is a question for the jury. While that is the law, the burden is on the plaintiff to prove that a comment is unfair and dishonest, and if there is no evidence on which a rational verdict could be found on the basis that the comment is malicious, as we hold in this case, the case should not be submitted to the jury.

Our conclusion, after a thorough consideration of this case, is that the court erred in failing to give an

instruction in the nature of a demurrer to the evidence. Having taken that view of the case, it is unnecessary to review the many other errors complained of in appellant's brief. For the foregoing reasons the judgment is reversed. *Ferriss, J.,* and *Brown, J.,* concur.

## ON MOTION FOR REHEARING.

KENNISH, J.—Because of the insistence of distinguished counsel for respondent as to the correctness of their contention, we have deemed it proper to review the more important points urged in support of the motion for a rehearing.

The publication complained of consisted of two parts: alleged facts, and comments thereon. Both the facts and the comment relate to the official acts of a public officer. That fact is disclosed by plaintiff's petition. One of the defenses was that the article, being a fair comment upon a matter of public interest, was protected by a qualified privilege and therefore was not actionable. Another defense was that of justification by alleging the truth of the facts published.

At the close of all the evidence the defendant asked the court to give an instruction directing a verdict for the defendant. The opinion filed herein holds that the plaintiff had not made out a prima facie case, and that the court erred in refusing said instruction.

In the motion for a rehearing and brief, respondent complains that the opinion is at variance with the law of libel, for the reason that if the article is libelous on its face, as the opinion holds, then the law presumes malice and falsity and, the publication being admitted, the evidence of the defendant could at most raise but an issue of fact for the jury, and not a question of law for the court. This complaint is sound as to the defense of justification, but it is unsound as to the defense of privilege.

The truth is always a defense to libel and available to all persons under the guaranty of the Constitution. In establishing that defense it is not essential that the defendant also rebut malice. Indeed that defense may be complete, though it be shown that the defendant was actuated by express malice. It follows that if in invoking the defense of qualified privilege, the defendant must prove the truth of the facts on which the comment is based, while the presumption of malice remains against him, he has gained nothing by the defense of privilege, for his burden is no less than under the defense of justification.

There is much contrariety of opinion in the decisions as to whether the plaintiff or defendant must bear the burden of proof upon the issue of the truth or falsity of the facts commented upon and upon the issue of malice, where the defense of qualified privilege of comment upon a matter of public interest is made, as in the case in hand. To attempt to reconcile the decisions would be an impossible task. The law applicable in case of the defense of privileged communication, a defense closely allied to that of privileged comment, is that the onus of proving both express malice and falsity rests upon the plaintiff. [Edwards v. Chandler, 14 Mich. 475; Konkle v. Haven, 140 Mich. 472; Trimble v. Morrish, 152 Mich. 624; Fowles v. Bowen, 30 N. Y. 20; Ashcroft v. Hammond, 197 N. Y. 488; Peterson v. Steenerson, 113 Minn. 87.]

In some jurisdictions the foregoing rule has been applied generally to the defense of qualified privilege, without distinction as to whether the privilege is invoked in a case of a privileged communication or a privileged comment upon a matter of public interest. This rule is adopted in the following cases: Cornelius v. Cornelius, 233 Mo. 1; Gattis v. Kilgo, 128 N. C. 402; Briggs v. Garrett, 111 Pa. St. 404; Cherry v. Des Moines Leader, 114 Iowa, 298; Coleman v. MacLennan, 78 Kan. 711.

In the case of Cornelius v. Cornelius, supra, l. c. 30, LAMM, J., speaking for this court, said: "There is a precept of the law to the effect that slanderous words are prima facie untrue. A presumption lies that way. Therefore when the occasion is semi-privileged—i. e., qualifiedly privileged—that presumption is suspended. Its suspension, however, leaves the matter open to proof of express malice, and plaintiff merely carries the burden of proving the accusation was not made in good faith but was false and made maliciously."

In the case of Gattis v. Kilgo, supra, l. c. 406, the court said: "And his honor correctly instructed the jury that the publication being admitted and being a qualifiedly privileged one, it was incumbent on the plaintiff to prove by the greater weight of evidence, not only that the publication was false, but that it was also malicious."

Other authorities hold that the burden of proving actual malice in case of a defense of privileged comment, rests upon the plaintiff, but that proof of such malice alone destroys the privilege. [Gott v. Pulsifer, 122 Mass. 235; Cranfill v. Hayden, 97 Tex. 544; Atwater v. Morning News, 67 Conn. 504; Tawney v. Simonson, 109 Minn. 341; Press Co. v. Stewart, 119 Pa. St. 584; Crane v. Waters, 10 Fed. 619; Newell on Slander and Libel (2 Ed.), p. 566; 25 Cyc. 402.]

In Gott v. Pulsifer, supra, l. c. 238, the court said: "The editor of a newspaper has the right, if not the duty, of publishing, for the information of the public, fair and reasonable comment, however severe its terms, upon anything which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications, for which no action can be maintained without proof of actual malice."

In Cranfill v. Hayden, supra, l. c. 562 and 564, in discussing the rule applicable to qualifiedly privileged publications generally, the court said: "When the

court finds that the publication is conditionally privileged, the effect of the holding is to cast upon the plaintiff the burden of proving that malice prompted the act—not merely malice which arises by implication of law, but malice in fact, otherwise denominated actual malice. In other words, if the publication be conditionally privileged, malice is not implied from the mere fact of the publication. . . . Where the alleged libel is conditionally privileged, the defendant may justify either by showing the privilege or by pleading and proving that the statements are true. But malice being proved and the privilege thereby removed, he must fall back upon his justification by proof of the truth of the charges; and we see no good reason why the ordinary rule applied in other cases upon that issue should not be applicable to him.''

On the other hand the doctrine is supported by the highest authority that if facts are stated in the publication upon which the comment is based, and such facts are false, then the defense of privileged comment fails. [Burt v. Advertiser Newspaper Co., 154 Mass. 238; Dunneback v. Tribune Printing Co., 108 Mich. 75; Vance v. Louisville Courier Journal Co., 95 Ky. 41; Evening Post v. Richardson, 113 Ky. 641; Farley v. McBride, 74 Neb. 49; Sweeney v. Baker, 13 W. Va. 158; Belknap v. Ball, 83 Mich. 583; Eikhoff v. Gilbert, 124 Mich. 353; Hubbard v. Allyn, 200 Mass. 166; Post Pub. Co. v. Hallam, 59 Fed. 530; Newell on Slander & Libel (2 Ed.), p. 568; Odgers on Libel & Slander (4 Ed.), p. 187, et seq.; Folkard on Slander and Libel, pp. 140 and 148; 25 Cyc. 401, et seq.; 18 Am. & Eng. Ency Law (3 Ed.), 1021.]

In Newell, supra, p. 568, discussing the law of qualified privilege of comment, the rule is laid down that: ''If the facts as a comment upon which the publication is sought to be excused do not exist, the foundation fails.''

In Burt v. Advertiser Newspaper Co., supra, l. c.,

p. 242, it is said: "We agree with the defendant, that the subject was of public interest, and that in connection with the administration of the customhouse the defendant would have a right to make fair comments on the conduct of private persons affecting that administration in the way alleged. But there is an important distinction to be noticed between the so-called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case a bona fide statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libelous, he will not be privileged if those facts are not true."

In Dunneback v. Tribune Printing Co., supra, l. c., 77, the court said: "Plaintiff was a candidate for a very responsible and important public office. Newspapers had the right to state, for the guidance of electors, any facts which affected his fitness for that office. The newspapers in such cases are not responsible for the inferences to be drawn from such facts. The law of libel requires in these cases that newspapers in their statements of fact observe an honest regard for the truth, and, when they have done so, they are not responsible."

It will be noted that under the rule of the authorities last cited the defense of privileged comment fails upon proof of the falsity of the facts alone, and it is not necessary that the plaintiff should prove in addition thereto that the publication was inspired by actual malice, as in the case of a defense of privileged communication. It should be observed further that under all the rules stated, proof of the falsity of the facts and

knowledge of such falsity is proof of actual malice.

We think there is good reason for recognizing the distinction thus made between the law applicable to the defense of privileged communications and that of privileged comment, making the privilege broader in the former than in the latter. In the former the communication is usually made under a sense of duty and to one person or a limited number of persons. The privilege of comment, on the other hand, while of the highest importance to the public welfare, is not made under a sense of duty, but is purely voluntary, and when the unlimited extent of the publication and the consequent injury to the complainant is considered, it would, in our opinion, be a most dangerous doctrine to require the plaintiff, in order to make a prima facie case, to prove not only that the facts were false, but also that the defendant was actuated by express malice.

We think the rule to be deduced from the authorities and in accord with the better reason, is that when a defense of privileged comment on a matter of public interest is presented by the issues, the plaintiff may overcome the privilege pleaded either by proof that the publication was inspired by actual malice, or that the facts published and commented upon were false. If he fail to prove the one or the other a prima facie case will not be made out, and the court, upon the request of the defendant, should give an instruction in the nature of a demurrer to the evidence. These two grounds of attack upon the privilege pleaded are available to the plaintiff in all cases, for in publications commenting upon matters of public interest, facts are always present, stated either expressly or by necessary implication.

Coming to the facts of the case in hand, we find that there was no substantial evidence of actual malice. The plaintiff was relying upon the legal presumption of malice, as in the case of a defense of justification. Therefore the privilege was not removed, as it would

have been by proof of actual malice. The only ground. left to meet and defeat that defense was proof that the facts were untrue. Here again plaintiff mistakenly relied upon the general presumption of falsity, which he could well have done if the defense had been justification alone, and not qualified privilege. The defendant, under the defense of justification, assumed the burden of proving the truth of the facts stated, and, as stated in the original opinion, the truth of the facts upon which the comment was made was practically uncontested. At all events there was no proof of their falsity, such as in the absence of proof of malice was necessary to destroy the defense of comment and criticism.

One alleged fact is referred to in the brief of respondent on the motion for a rehearing, for the first time, which deserves notice. The article complained of stated: "The bank's books were examined just before Ex-Secretary of State Cook went out of office, but no action was taken and the bank was left open to take the money of unsuspecting depositors." Respondent now contends as to that part of the article that: "It is necessarily implied therefrom that plaintiff so kept the bank open until June, 1905, whereas the fact is, undisputed in the evidence, that plaintiff went out of office as Secretary of State on January 9, 1905," etc. Respondent's complaint is untenable for the reason that whether we treat such alleged fact as bearing upon the defense of justification or privilege, the language is not susceptible of the construction that plaintiff was responsible for keeping the bank open after he went out of office, and the evidence was uncontradicted that it did remain open so long as plaintiff remained in office.

After a full reconsideration of this case, we find the motion for rehearing to be without substantial merit, and it is therefore overruled. *Ferriss, P. J.,* and *Brown, J.,* concur.